1

2                                                      **E-Filed 8/27/2009**

3

4

5

6

7

8                    **IN THE UNITED STATES DISTRICT COURT**

9               **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

10                              **SAN JOSE DIVISION**

11

12  E.M., a minor, by and through his parents, E.M.        Case Number C 06-4694 JF
    and E.M.,
13                                                          ORDER[1] (1) GRANTING
                       Plaintiffs,                          DEFENDANT'S MOTION FOR
14                                                          SUMMARY JUDGMENT AND (2)
              v.                                            DENYING PLAINTIFFS' MOTION
15                                                          FOR SUMMARY JUDGMENT
    PAJARO VALLEY UNIFIED SCHOOL
16  DISTRICT, OFFICE OF ADMINISTRATIVE                      [re:  doc. nos. 101 and 105]
    HEARINGS, and CALIFORNIA DEPARTMENT
17  OF EDUCATION,

18                       Defendants.

19

20          Plaintiffs E.M., a student in Defendant Pajaro Valley Unified School District

21  ("PVUSD"), and his parents seek to reverse a decision of the California Office of Administrative

22  Hearings ("OAH"), in which an administrative law judge ("ALJ") affirmed the district's

23  determination that E.M. was ineligible for special education services under the Individuals with

24  Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.* (2004).  PVUSD moves for an

25  order affirming the ALJ's decision in its entirety.  The Court previously remanded the instant

26  action to the ALJ with instructions to provide additional written analysis.  The record now is

27  _____

28          [1]  This disposition is not designated for publication in the official reports.

Case No. C 06-4694 JF
ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ETC.
(JFLC1)

1  sufficient for the Court to adjudicate the instant cross-motions for summary judgment.  Having

2  considered the two rounds of briefing, the arguments presented at two hearings and the

3  voluminous administrative record, and for the reasons set forth below, the Court will grant

4  PVUSD's motion for summary judgment.  Plaintiffs' cross-motion will be denied.

5                                              **I.  BACKGROUND**

6         The relevant facts are as follows.[2]  E.M. is a bilingual student who has been enrolled in

7  PVUSD's regular education program since beginning kindergarten in 1999.[3]  *See* Administrative

8  Record ("AR") 2173-79.  After kindergarten, E.M. was designated as being at risk of retention

9  and thus was required to attend summer school to work on his reading skills.  AR 2185-87.  A

10 similar assessment was made after he completed the first grade.  AR 2197.  During second grade,

11 state standardized testing showed a basic (average) level in math and a below basic level in

12 language arts.  AR 2202; 2204-05.  By the spring of his third grade year, he scored basic in

13 language arts but below basic in math.[4]  AR 2202.  The same test results were achieved during

14 the fourth grade, although E.M.'s math score approached the basic level.  *Id.*

15

16        [2] A significant portion of the administrative record contains testimony of limited
   probative value, including observations of individuals who did not observe E.M. in the classroom
17 or had no personal knowledge of E.M.'s performance in school.  In addition, because Plaintiffs
   filed their due process complaint on December 5, 2005, the applicable statute of limitations only
18 permits Plaintiffs to litigate only those claims that arose after December 5, 2002.  *See* Cal. Educ.
   Code § 56505(n).  Accordingly, any facts pertaining to events prior to December 2002, at which
19 time E.M. was in the middle of his third-grade year, are included only to provide additional
20 background.

21        [3] Whether E.M. is bilingual is relevant to a determination of eligibility for special
   education services, both under IDEA and the methods employed by PVUSD to ascertain
22 eligibility.  It is undisputed that E.M. is from a bilingual household, AR 468, and that Spanish
   was the primary language in Plaintiff's household during at least part of the period in question.
23 AR 1797.  E.M.'s mother also indicated on a school enrollment form that E.M's first language
   was Spanish.  AR 2175.  When E.M. started in PVUSD, his mother chose a "Structured English
24 Immersion Program" as opposed to the mainstream English program or a bilingual program.  AR
25 2176.  While the record is not conclusive on this point, there is sufficient evidence to suggest that
   E.M. has remained bilingual, as demonstrated by the fact that he informed an evaluator that he
26 "dreams in English and Spanish."  AR 1221.

27
28        [4] There are five levels of scoring on the state exams: far below basic, below basic, basic,
   proficient, and advanced.  *See* AR 2204.

                                              2

1    E.M. was enrolled in the third grade during the 2002-2003 academic school year. He did

2    not perform well during the first quarter, again becoming a retention risk. AR 1806. However,

3    he was not at risk for retention for the remaining three quarters, and while his teacher described

4    him as "easily distracted," she also wrote in his grade report that E.M. was "very bright" and

5    "extremely capable." *Id*. During the third grade, E.M. began to exhibit difficulties with turning

6    in his homework. According to his mother, the homework would be completed but left at home

7    or elsewhere in the classroom. AR 523-24. In general, E.M. had trouble following his parents'

8    directions. AR 524. When questioned by his parents as to why he failed to complete his chores

9    or his homework, his typical response was to cry. AR 524-525.

10    E.M. entered fourth grade in fall 2003, and he had a slow start and again was designated

11    as a retention risk. AR 1808. In her first quarter report, E.M.'s teacher, Susan Audet, noted that

12    E.M. was "easily distracted" even when placed at the front of the class. AR 1812. However, Ms.

13    Audet testified at the due process hearing that E.M. displayed average to above-average skills in

14    reading comprehension and above-average geometry skills. AR 1450, 2245. Overall, Ms. Audet

15    described E.M. as an "average" student who was in the "middle" of his class in terms of his

16    academic skills. AR 1451. E.M. did not present any disciplinary issues. AR 1454-55. In fact,

17    Ms. Audet described E.M. as having "many friendships, was very outgoing, had a good sense of

18    hum[or]…E.M. just seemed like a—like he never required the [special education] referral to

19    me." AR 1457. However, she also described his grades as "poor" and attributable to

20    inconsistent testing skills and work production. AR 1455. In particular, Ms. Audet testified that

21    E.M. had issues with turning in his homework, and on at least one occasion he told his teacher

22    that he preferred to play video games after school. *Id*. At the due process hearing, E.M.'s mother

23    testified that she was informed by Ms. Audet about E.M.'s apparent distractibility, and that he

24    would often "look at the clock." AR 538. E.M.'s mother and Ms. Audet also communicated

25    frequently with respect to the homework issue. AR 542-43. At that time, E.M.'s mother did not

26    hire a tutor because she and Ms. Audet agreed that it "would be a waste of time." AR 546.

27    E.M.'s mother also confirmed that Ms. Audet did not suggest a referral for special education.

28    AR 561-62.

3

1    E.M. was promoted to the fifth grade on the condition that he attend summer school.  AR

2    1814.  During the summer prior to the new school year, E.M.'s parents retained Dr. Roslyn

3    Wright to evaluate whether E.M. suffered from a learning disability.[5]  *See* AR 1819-25.  During

4    the four-hour evaluation session, Dr. Wright administered two different standardized assessment

5    tools:  (1) the Wechsler Intelligence Scale for Children, Third Edition ("WISC-III") and (2)

6    Woodcock-Johnson Tests of Achievement-III ("WJ-III").[6]  AR 1083; 1820.  She also conducted a

7    brief interview with E.M.'s mother.  AR 991-92; 1083; 1820.  On the WISC-III test, which

8    measures cognitive ability, E.M.'s scores were Verbal IQ: 88, Performance IQ: 104, and Full

9    Scale IQ: 95.  The first score was in the low average range, and the latter two scores were in the

10   average range.  AR 1820-21.  The subtests that gave rise to these three primary composite scores

11   were similar in range, with E.M. scoring in the average to low average range.  AR 1821.  With

12   respect to the WJ-III test, which measures achievement rather than ability (*i.e.*, the capability to

13   assess and process information as opposed to innate ability), E.M. scored in the average range for

14   all the areas of potential disability, including basic reading, broad reading, oral expression, broad

15   writing, listening comprehension, written expression, and oral language.  AR 1822-23.  "Mild"

16

17   _____

18       [5] The record demonstrates that E.M.'s parents hired Dr. Wright at the urging of their
     immigration attorney, with the intent to use her report in immigration proceedings.  AR 567-69;

19   1083.  The majority of Dr. Wright's evaluative work with children focuses on immigration cases
     in which proof of a learning disability can impact the child's ability to stay in the United States

20   and receive services.  AR 1108-1109.  At the due process hearing, E.M.'s mother confirmed that
     the initial impetus to obtain the testing by Dr. Wright was for "immigration purposes."  AR 567-

21   69.  Dr. Wright acknowledged the referral from the immigration attorney and stated that a
     diagnosis of a learning disability could affect the family's immigration status.  AR 1109.  In

22   addition, Dr. Wright's report, dated July 23, 2004, was addressed to the immigration attorney.
     AR 1819.

23

24       [6] At the due process hearing, Dr. Wright testified that the WISC-III looks at "overall
     intellectual ability" with a breakdown into verbal, non-verbal and full scale score.  The verbal

25   score reflects the ability to use and understand language; whereas nonverbal skills relate to
     problem solving without language.  The scores then are combined for a full scale score, which is

26   a general estimate of intellectual ability.  AR 996-98.  Dr. Wright described the WISC-III as a
     reliable measure of cognitive abilities and wrote in her report that "[a]lthough there are numerous

27   measures of children's intelligence, the Wechsler scales remain by far the most popular."  AR
     1093-1094; 1821.

28

1   impairment was found in the areas of listening comprehension and oral language.  AR 1823.  In

2   her report, Dr. Wright stated that these test results "suggested that [E.M.] is suffering from a

3   specific learning disability, requiring significant remediation in order for him to achieve his full

4   potential."  AR 1820.  Her ultimate diagnosis was based on the criteria set forth in the Diagnostic

5   and Statistical Manual of Mental Disorders ("DSM-IV"), which states that a disability exists

6   when there is a significant discrepancy between ability and achievement.  Under the DSM-IV

7   criteria, such a discrepancy exists if there is a difference of at least a one standard deviation

8   between ability (as scored by the WISC-III) and actual achievement (as measured by the WJ-III)

9   scores.  *See* AR 1092, 1823.  According to Dr. Wright's assessment, such a statistical difference

10   was present in the area of oral language.  AR 1823.  At the due process hearing, Dr. Wright

11   testified that she did not speak to any of E.M.'s teachers, review E.M.'s records, or observe E.M.

12   in the classroom as part of her evaluation.  AR 1085-87.  She also admitted that her evaluation

13   would be more accurate if such additional information was available.  AR 1088.  Dr. Wright

14   stated that she did not attempt to gather additional data because the purpose of the report was to

15   determine whether there was a learning disability that would be relevant to the family's

16   immigration status, not whether E.M. had a learning disability as defined by IDEA.  AR 1085.

17   The report culminated in a diagnosis of eligibility for services under the Americans with

18   Disabilities Act ("ADA"), which presumably was to be used in immigration proceedings.  *See*

19   AR 1824.  For example, the report stated that a move to Mexico would present issues because of

20   E.M.'s disability and apparent preference for English over Spanish.[7]

21        After receiving Dr. Wright's report, E.M.'s mother requested that PVUSD perform a

22   formal assessment of her son's abilities.  AR 1208.  In response, PVUSD psychologist Leslie

23   Viall met with E.M.'s mother, *see* AR 578-80; 1210, and then Ms. Viall and Nancy Navarro, the

24   PVUSD District Resource Specialist, reviewed E.M.'s academic files and Dr. Wright's report.

25   AR 2227.  Ms. Viall and Ms. Navarro also spoke with E.M.'s fifth grade teacher, who again was

26   Ms. Audet, and provided Ms. Audet with a classroom intervention log to track E.M.'s behavior.

27

28       [7] When the record is viewed in its entirety, any representations that E.M. was an English-only speaker or performed better in English as opposed to Spanish are not credible.

Case No. C 06-4694 JF
ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ETC.
(JFLC1)

1   AR 1210-11; 2222-2223; 2227.  Ultimately, Ms. Viall and Ms. Navarro concluded that a referral

2   was appropriate, and an assessment plan, to which E.M.'s mother consented, was prepared.  AR

3   2227. The assessment included testing of E.M.'s cognitive, perceptual-motor and behavioral

4   functions. AR 1213-14; 1847.  The written assessment report, authored by Ms. Viall, also

5   referenced the results from the tests performed by Dr. Wright.  AR 1847.  *See also* AR 1213.  In

6   addition, the report included a description of conversations with E.M. and his parents as well as a

7   summary of E.M.'s academic files and observations of E.M.'s classroom behavior.  *See*, *e.g*., AR

8   1213-14; 1845, 1847-48.  The report also summarized a series of diagnostic tests administered by

9   Ms. Viall.  These included the Kaufman Assessment Battery for Children test ("K-ABC") and the

10  Test of Nonverbal Intelligence-3 ("TONI").  AR 1213-14; 1848-49.  At the due process hearing,

11  Ms. Viall testified that the WISC-III was normally her "test of choice" but that she chose to

12  administer the K-ABC in light of Dr. Wright's recent administration of the WISC-III.  AR 1222-

13  23.  On the K-ABC, which is divided into four processing subtests, E.M. received the following

14  scores: (1) Sequential Processing: 95; (2) Simultaneous Processing: 120; (3) Mental Processing

15  Composite: 111; and (4) Nonverbal: 113.  AR 1848.  In her report and at the due process hearing,

16  Ms. Viall stated that these scores were "average."  AR 1224; 1849.  Ms. Viall also testified that

17  because she felt that E.M's K-ABC and WISC-III scores were not "consisten[t]," *see* AR 1273,

18  she chose to administer a third ability-measuring test (the TONI), on which E.M. scored 98, a

19  score that fell into the average range.  AR 1849.

20      Based on the apparent correlation between the TONI and the WISC-III scores, as well as

21  her belief that the K-ABC was not the most reliable test under the circumstances, Ms. Viall

22  concluded that E.M.'s K-ABC score may have been inaccurate.  AR 1226; 1235; 1270-71.  She

23  therefore used Dr. Wright's WISC-III results to determine whether E.M. had a specific learning

24  disability.  When E.M.'s WJ-III achievement results were compared to his WISC-III performance

25  IQ score of 104, there was not a severe statistical discrepancy between ability and achievement.[8]

26

27      [8] Eligibility determination under IDEA and applicable California law uses a formula that
    differs from the DSM-IV criteria, in that a 22.5 point difference is needed between the ability and
28  achievement scores.  *See* Cal. Code Regs. tit. 5, § 3030(j)(4)(A); *Ford ex rel. Ford v. Long Beach*

AR 1857.  The parties do not dispute that there is a significant statistical deviation in oral

language if the K-ABC mental processing composite score of 111 is used.

Several additional tests were conducted, all of which resulted in average scores.  On the

Connors Rating Scales measure, which involves assessment ratings by a teacher and a parent, the

results showed an average evaluation on the teacher assessment, while the mother's assessment

"suggests that [E.M.]'s mother sees a significantly high level of inattentive behavior."  AR 1849;

1229-1231.  On visual memory test, E.M. scored higher in Spanish as opposed to English.  AR

1850.  Finally, the report contained multiple observational assessments, including:

> "[E.M.]'s dual language issues can be the reason for some
> expressive language and writing weaknesses…
>
> Teachers have noted attentional issues though the years.  However,
> these attentional issues do not seem to be severely impacting his
> learning…
>
> I don't think he will have a [severe] discrepancy [in test scores].  I
> think he will continue to improve in the classroom without Sp. Ed.
> help.  So does his teacher.  We need to work on him staying
> focused and completing work in the classroom.

AR 1852.

Ultimately, Ms. Viall and Ms. Navarro concluded that "[E.M.] does not qualify for

special education services.  The assessment team agrees that interventions in the regular

education program could be implemented to improve [E.M.]'s attention and work completion in

his class."  AR 1857.  Instead, a 504 Accommodation Plan (the "504 Plan") was implemented,

which included a number of classroom-based interventions designed to address E.M's

distractibility and difficulties with completing his work.[9]  AR 1862-63.

*Unified Sch. Dist.*, 291 F.3d 1086, 1088 (9th Cir. 2002).

[9] Section 504 of the Rehabilitation Act "was enacted as a general civil rights provision 'to prevent discrimination against all handicapped individuals…in employment, housing, transportation, education, health services, or any other Federally-aided programs."  *Alexopulos v. San Francisco Unified Sch. Dist.*, 817 F.2d 551, 554 (9th Cir. 1987).  The implementing regulations of Section 504 create a separate duty apart from IDEA to provide an appropriate education.  *See W.H. ex rel. B.H. v. Clovis Unified Sch. Dist.*, No. CV F 08-0374, 2009 WL 1605356, at *6 (E.D. Cal. June 8, 2009) ("Section 504 protects [a] Student if he or she has a physical or mental impairment that substantially limits one or more of life activities, or if he or

7

On October 13, 2004, the District convened an individualized education plan ("IEP") team meeting to discuss the results of the initial assessment. AR 1866. The team included Ms. Viall and Ms. Audet, and E.M.'s mother attended the meeting.[10] *Id.* The IEP team determined that E.M. did not qualify for special education services and was not a student with a specific learning disability. *Id.* E.M.'s mother did not agree with this assessment, and within a month Plaintiffs had retained counsel to review PVUSD's decision. *See* AR 1868. In the meantime, E.M. progressed through the fifth grade, which in terms of academic performance appeared similar to his fourth-grade year. His standardized-testing score in math improved to the basic level. AR 2354. In addition, a January 2005 assessment of the results of the 504 Plan indicated that five of the classroom intervention measures had proved to be effective. AR 2257-58. At the end of fifth grade, E.M. again was designated as a retention risk and was required to attend summer school. AR 1923.

As discussed above, E.M.'s parents did not agree with the initial assessment and through their attorney requested that PVUSD perform an additional assessment. AR 1878. In addition, Dr. Wright submitted a letter to PVUSD in January 2005, in which she stated that if the K-ABC

---

she has a record of or is regarded as having such an impairment."). In other words, "[b]oth sections 504 and IDEA have been interpreted as requiring states to provide a free appropriate public education to qualified handicapped persons, but only IDEA requires development of an IEP and specifically provides for transition services to assist students [to] prepare for a post-high school environment. Under the statutory scheme, the school district is not free to choose which statute it prefers." *Yankton Sch. Dist. v. Schramm*, 93 F.3d 1369, 1376 (8th Cir. 1996). However, a student may be eligible for a 504 Plan based on a disability but not require accommodation through an IEP under IDEA if the disability does not result in a specific learning disability. *See W.H.*, 2009 WL 1605356, at *7 ("By definition, the IDEA only applies to children with disabilities who require special education and related services.") (citing 20 U.S.C. § 1401(3)(B)). E.M. has not presented a claim under the Rehabilitation Act and thus whether the 504 Plan was adequate under its separate statutory scheme is not at issue here.

[10] The mother testified that at the initial IEP assessment meeting, Ms. Audet stated that a 504 Plan was not necessary or would be ineffective because E.M. merely needed "to be mature." AR 607. In addition, E.M.'s mother testified that she believed a 504 Plan had not been implemented, *see* AR 624, and that the principal at E.M.'s elementary school had refused to approve a 504 Plan without further testing. AR 629-30. However, the record reflects that a 504 Plan appears to have been implemented, at least during part of the relevant period in question.

8

1    score of 111 were used instead of the WISC-III score of 104, a statistically severe discrepancy

2    between ability and achievement would be evident.  AR 1875.  A second assessment

3    subsequently took place in May 2005, this time conducted by Ms. Navarro.  AR 1925.  The

4    results were largely the same as in the case of the October 2004 assessment, and E.M.'s attention

5    issues again were acknowledged.  *See* AR 1927.  Notably, the report stated that E.M.'s reading

6    ability was above-average and rated at the sixth-grade level under the Houghton-Mifflin test.  AR

7    1928.  The conclusions and recommendations were the same—that classroom intervention

8    measures could be used to treat any behavioral issues, and that E.M. was not eligible for special

9    education services.  AR 1928.

10        A third assessment was performed in June 2005, this time by Laurel Nakanishi, a PVUSD

11    speech and language specialist.  AR 1514, 1936.  Testing was conducted in both English and

12    Spanish.  AR 1939-40.  On the Spanish-language tests, E.M. performed at or above the mean.

13    AR 1939.  On the English-language tests, E.M. scored at the mean or below the mean but within

14    the normal range.  AR 1940.  The written assessment noted that E.M. had issues with noise

15    distraction, and Ms. Nakanishi recommended that he use earplugs or headphones while doing

16    homework.  AR 1940.  Ms. Nakanishi's report also noted that no intervention was required

17    because there was no significant delay in E.M.'s speech or language skills.  *Id*.  On June 7, 2005,

18    toward the end of E.M.'s fifth grade school year, the IEP team met to discuss the assessment

19    results.  AR 1945.  E.M.'s parents attended the meeting with their attorney.  AR 1942.  PVUSD

20    again informed the parents that E.M. was not considered to be eligible for special education

21    services, and at the meeting the parents voiced their disagreement and their intent to provide a

22    written response.  AR 1943.

23        In the fall of 2005, E.M. entered the sixth grade at Cesar Chavez Middle School.  At the

24    due process hearing, Shelby Speer, who was E.M.'s instructor for language arts and social

25    studies, testified that E.M. initially displayed attention problems, but with some help those issues

26    improved to the point that E.M. was "really focused now, no issues at all."  AR 1588-89.  Ms.

27    Speer considered E.M. "one of [the] top students in the class," earning "all A's or B's."  AR

28    1576.  She also testified that E.M. "completes all of the work.  He does a great job on his work.

9

He helps other students." *Id*. *See also* AR 1578.  According to Ms. Speer, E.M. was able to read at grade level, his reading comprehension was "excellent," and he may have been promoted to a more advanced class had there been capacity.  AR 1576, 1581.

Despite this progress, E.M. continued to be below average when it came to completing his homework.  Ms. Speer testified that she did not understand the cause of this issue, and that she believed that E.M. had the capability to complete the work.  AR 1636.  E.M. also struggled initially in math and science, earning failing marks.  According to the school principal, Ian MacGregor, the instructor for those classes had "poor" classroom management skills.[11]  In addition, the principal testified that many of the students in those classes were receiving failing grades, largely because of the instructor's poor teaching skills and her selection of inappropriate teaching material.  AR 1707-08.  These issues led Mr. MacGregor to intervene in the class, which resulted in an improvement in student performance.  AR 1709-10.  While the principal was familiar only with E.M.'s performance in math, he did testify that after the intervention E.M.'s grade improved to a "C-plus, B, right in there."  *Id*.  Mr. MacGregor also had observed E.M. in the classroom, and he testified that E.M. exhibited "good" behavior, and that E.M. had been referred to the principal once by a substitute teacher for talking too much.  AR 1711.  The principal noted E.M.'s improvement in standardized testing, and that by the sixth grade he scored at the basic level in math.  AR 1713.  Mr. MacGregor also stated that he did not consider E.M. a candidate for special education services.  AR 1713-14.

In November 2005, E.M.'s parents obtained a private auditory evaluation by Dr. Ruth Kaspar, who concluded that E.M. had an auditory processing disorder and a "probable learning disability."  AR 1956-1959.  Dr. Kaspar's assessment did not include in-class observations of E.M.  AR 893-94.  At the due process hearing, Dr. Kaspar clarified her use of the term "probable" in that she was not trained to diagnose learning disabilities and thus could not make a formal diagnosis.  AR 875.  She also admitted that some aspects of E.M.'s apparent abnormalities might be attributable to the normal developmental process, but when the results

_____

[11] The instructor in question was unable to testify at the due process hearing because she was absent on medical leave. *See* AR 1706.

10

1   were viewed "global[ly]" she believed her diagnosis to be correct.  AR 874-75.  To review Dr.

2   Kaspar's report, PVUSD retained Dr. Jody Winzelberg, head of Auditory and Speech Pathology

3   at Lucile Packard Children's Hospital.  AR 1641; 1649.  Dr. Winzelberg concluded that E.M.'s

4   test results did not show an auditory processing disorder but rather "some weaknesses in the

5   auditory system, but by and large he performed with the normal range on most of the testing."

6   AR 1670.  In addition, E.M. had suffered from "many" ear infections as an infant.  AR 1956.

7   Both doctors testified that such infections could have been the cause of some weakness in one

8   ear.  *See* AR 871, 1658.

9          On December 5, 2005, E.M. filed an administrative complaint with the Special Education

10  Division of the OAH, challenging PVUSD's denial of special education services.  The ALJ

11  assigned to the matter conducted a prehearing conference on February 23, 2006, and the due

12  process hearing commenced on February 28, 2006.  The ALJ outlined the following issues for

13  resolution:

14          (1) Did the District fail to fulfill its child-find and search and serve
            obligations from December 5, 2002, through to the present?
15

16          (2) Did the District fail to consider a parent-obtained assessment at
            the October 2004 IEP team meeting, and if so, did this procedural
            violation result in a denial of a FAPE to Student?
17

18          (3) Did the District deny Student a free appropriate public
            education ("FAPE") from December 2002 to the present because it
            failed to find Student eligible under the category of SLD?
19

20          (4) Did the District fail to assess Student in all areas of suspected
            disability in October 2004 and May 2005, when it failed to assess
            Student's auditory processing, hearing and behavior?
21

22          (5) If Student prevails on any or all of Issues 1 through 4, above, is
            Student entitled to the following relief: (a) a private assistive
            technology assessment; (b) a private behavior observation; (c)
23          auditory integration therapy; (d) a private speech and language
            assessment; (e) parent training to be provided by the private
24          assessors and therapy providers; (f) a determination that Student is
            eligible for special education and related services as a student with
25          an SLD; and (g) tutoring?

26  AR 263.  The due process hearing lasted six days.  On May 5, 2006, the ALJ issued a decision

27  finding in favor of the District as to all issues.  AR 262-276.  Plaintiffs appealed the decision to

28  this Court, which conducted full briefing and oral argument, and on October 17, 2008 remanded

                                               11

1    the matter to the ALJ for further written analysis with respect to certain legal and factual

2    conclusions.  On May 29, 2009, the ALJ issued a revised decision (the "ALJ Remand Order").

3    **II.  LEGAL STANDARD**

4        In considering an appeal of an administrative decision regarding the rights of a student

5    with alleged disabilities, the district court shall review the full administrative record and may

6    consider additional evidence upon the request of the parties.  20 U.S.C. § 1415(i)(2)(C).  The

7    court shall then render a decision based upon the preponderance of the evidence and grant any

8    appropriate relief.  *Id*.  The factual findings of the administrative agency should be given "due

9    weight."  *Bd. of Educ. of the Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 206

10   (1982).  *See also Hood v. Encinitas Union Sch. Dist.*, 486 F.3d 1099, 1104 n.4 (9th Cir. 2007)

11   ("the fact-intensive nature of a special education eligibility determination coupled with

12   considerations of judicial economy render a more deferential approach appropriate.").  The "due

13   weight" standard "differs substantially from judicial review of other agency actions, in which

14   courts generally are confined to the administrative record and are held to a highly deferential

15   standard of review."  *Ojai Unified Sch. Dist. v. Jackson*, 4 F.3d 1467, 1471 (9th Cir. 1993).

16   Instead, the "due weight" standard allows a court to make its own factual findings in addition to

17   those made by the administrative agency.  *Ms. S. ex rel. G. v. Vashon Island Sch. Dist.*, 337 F.3d

18   1115, 1126 (9th Cir. 2003).  Increased deference may be given where the findings of the

19   administrative agency "are thorough and careful."  *Union Sch. Dist. v. Smith*, 15 F.3d 1519, 1524

20   (9th Cir. 1994); *Ojai*, 4 F.3d at 1476.  If the administrative agency's findings are supported by a

21   preponderance of the evidence, such findings should be affirmed.  *Ojai*, 4 F.3d at 1474.  *See also*

22   *R.B., ex rel. F.B. v. Napa Valley Unified Sch. Dist.*, 496 F.3d 932, 942 (9th Cir. 2007) (attempts

23   to "second-guess" well-reasoned factual findings should be "summarily dismissed").

24        During the administrative process, the petitioning party has the burden of proof.  *See*

25   *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 52 (2005); *R.B.*, 496 F.3d at 939 n.6.  In addition,

26   the "burden of proof in the district court rest[s] with …the party challenging the administrative

27   decision."  *Hood*, 486 F.3d at 1103.

28

12

1

### III. DISCUSSION

2      Under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.*

3  (2004), the state must provide a free appropriate public education ("FAPE") to all students with

4  disabilities.  *See* 20 U.S.C. § 1412(a)(1).  IDEA defines a child with a disability as one with

5  "mental retardation, hearing impairments (including deafness), speech or language impairments,

6  visual impairments (including blindness), serious emotional disturbance…orthopedic

7  impairments, autism, traumatic brain injury, other health impairments, or specific learning

8  disabilities."  20 U.S.C. § 1401(3)(A)(ii)-(ii).  Further, for children between the ages of three and

9  nine, a child with a disability may also include "at the discretion of the State and the local

10 educational agency," children who are "experiencing developmental delays, as defined by the

11 State and as measured by appropriate diagnostic instruments and procedures, in 1 or more of the

12 following areas: physical development; cognitive development; communication development;

13 social or emotional development; or adaptive development"  20 U.S.C. § 1401(3)(B).

14     A school district's obligations under IDEA include implementation of a "child find"

15 program, which "requires the State to design a program to identify and provide services to

16 children with special educational needs."  *Miller ex rel. Miller v. San Mateo-Foster City Unified*

17 *Sch. Dist.*, 318 F. Supp. 2d 851, 853 (N.D. Cal. 2004) (citing 20 U.S.C. § 1412(a)(3)).[12]  If a

18 student is determined to be eligible for special education services, the school district must design

19 an IEP for that student.  20 U.S.C. § 1414(d).  Parents have the right to participate in both the

20 development and continued implementation of their child's IEP.  20 U.S.C. § 1415(b).  If parents

21 disagree with a school district regarding "any matter relating to the identification, evaluation, or

22 educational placement of the child, or the provision of a free appropriate public education to such

23 child," they are entitled to an impartial due process hearing before a state agency.  20 U.S.C. §

24 1415(b)(6)(A), (f).  If the parents disagree with the results of the administrative hearing before

25

26

27  [12] California's implementation of IDEA is codified at Cal. Educ. Code §§ 56000 *et seq.*
   The child find obligations and determination of appropriate educational remedies are performed
28 by the "district, special education local plan area, or county office" of the child's residence.  Cal.
   Educ. Code § 56300.

Case No. C 06-4694 JF
ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ETC.
(JFLC1)

1    the state agency, an appeal may be brought before a district court.  20 U.S.C. § 1415(i)(2)(A).

2          As a threshold matter, Plaintiffs contend that the decision of the ALJ should be accorded

3    no deference because the ruling was conclusory and unsupported by the administrative record.

4    According to Plaintiffs, a *de novo* review of the administrative record reveals clearly that

5    PVUSD failed to fulfill its child-find obligations prior to being notified of Dr. Wright's

6    assessment by E.M.'s mother.  In addition, Plaintiffs argue that PVUSD's refusal to classify E.M.

7    as being eligible for an IEP violated the district's obligation to provide E.M. with a FAPE.

8    Plaintiffs thus contend that E.M. was denied a FAPE during all relevant periods, both through

9    procedural and substantive errors.  These issues are addressed in turn below.

10          A.  Deference Accorded to Administrative Decision

11          Administrative decisions in cases brought under IDEA should be supported by "fairly

12   detailed findings...to permit courts to review those decisions intelligently."  *Vincent on Behalf of*

13   *Vincent v. Heckler*, 739 F.2d 1393, 1394 (9th Cir. 1984).  By initially remanding the matter to the

14   ALJ for more a more thorough written analysis with respect to certain legal and factual

15   conclusions, the Court implicitly agreed with E.M. that a lack of detail would affect the degree of

16   deference given to the ALJ decision on review.  *See R.B.*, 496 F.3d at 942-43 (no deference

17   accorded when findings fail to cite supporting evidence).  In his revised decision, however, the

18   ALJ has set forth additional factual findings that support at least some deference on review.  In

19   addition, the administrative record shows that the ALJ engaged in extensive questioning of

20   witnesses during the due process hearing, which also supports a conclusion that *de novo* review

21   would be inappropriate.  *See id.* at 942 (deference is due "when the officer participates in the

22   questioning of witnesses and writes a decision 'contain[ing] a complete factual background as

23   well as a discrete analysis supporting the ultimate conclusions.'").  The fact that the conclusions

24   supported by the ALJ's revised findings are identical to those in the ALJ's initial order is

25   irrelevant.  The Court's remand order was not meant as a mandate to the ALJ to reconsider or

26   revise any of his factual findings or legal conclusions.  Accordingly, where the record reflects

27   that the ALJ considered the evidence and rendered a thoughtful analysis, the Court will accord

28   due weight to those findings.

1

B.  Child-Find Obligations

2        The child-find concept imposes an affirmative duty on school districts to identify children

3  who may be eligible (and could benefit from) a special education program, even in the absence of

4  a parental request.  *See* 20 U.S.C. § 1412(a)(3)(A) ("All children with disabilities … are [to be]

5  identified, located and evaluated.").  *See also W.H.*, 2009 WL 1605356, at *5 ("IDEA and

6  California state law impose upon each school district the duty actively and systematically to

7  identify, locate, and assess all children with disabilities or exceptional needs who are in need of

8  special education and related services.").  "A district's child find obligation toward a specific

9  student is triggered when there is a reason to suspect a disability and that special education

10 services may be needed to address that disability."  *W.H.*, 2009 WL 1605356, at *5.  However, "a

11 child is denied a FAPE only when the procedural violation 'result[s] in the loss of educational

12 opportunity or seriously infringe[s] the parents' opportunity to participate in the IEP formation

13 process.'"  *R.B.*, 496 F.3d at 938 (quoting *W.G. v. Bd. of Trustees of Target Range Sch. Dist. No.*

14 *23*, 960 F.2d 1479, 1484 (9th Cir.1992)).  "Once the child qualifies for special education

15 services, the district must then develop '[a]n IEP which addresses the unique needs of the

16 child.'"  *Id.* at 946.  Accordingly, a procedural violation does not necessarily result in the denial

17 of a FAPE and of IDEA.  *See id.* at 938.  Instead, where a student is found to be "substantively

18 ineligible for IDEA relief," any procedural irregularities may constitute "harmless" error.  *Id.* at

19 947.

20        The relevant period in question is December 2002 through September 2004, when

21 PVUSD initiated an assessment after being provided with the results of the tests performed by

22 Dr. Wright.  In its remand order, the Court requested that the ALJ provide additional support for

23 his conclusion that PVUSD satisfied its child-find obligations during this period.  With respect to

24 E.M.'s third-grade year, the revised order states in relevant part:

25              The District was required to initiate its own referral within a
                reasonable time after it had knowledge of facts tending to establish
26              a disability and the need for special education services.  The
                evidence established that [the] District had no knowledge of facts
27              tending to establish that [E.M.] had a disability during the 2002-
                2003 school year.  [E.M.] presented as a child with some
28              weaknesses, including distractibility, focus, problems working

15

independently and efficiently, and difficulty completing all of his assignments.  In hindsight, these may appear to have been suspected disabilities.  However, at the time in question, despite these weaknesses, [E.M.]'s report card reflects that he fared "well" in reading and math, and his writing skills improved during the school year.  Moreover, without special education or related services, [E.M.] progressed in the general education curriculum sufficiently to advance to the next grade.

ALJ Order ¶ 8a.  Based on its review of the record in the instant case, the Court concludes that the findings of the ALJ were correct with respect to the 2002-2003 school year.  E.M.'s final report card for third grade stated that E.M. was not a retention risk, and as discussed above, E.M.'s third-grade teacher described him as "bright" and "extremely capable."  AR 1806.  His standardized test scores were either basic or below basic.  Moreover, the evidence in the record relating to this time period is relatively sparse as compared to the 2003-2004 and 2004-2005 school years, and Plaintiffs have the burden of proof.  Accordingly, the Court concludes that PVUSD satisfied its child-find obligations during 2002-2003.[13]

In contrast to his experience in the third grade, E.M.'s "performance declined considerably during the fourth grade.  [He] received marks of 'C' and 'D' in reading, 'D' in writing, 'B' in listening and speaking and 'C' in mathematics.  [E.M.] was designated as 'at risk for retention' because of his poor classroom performance.  [He] was easily distractible and frequently failed to turn in homework."  ALJ Remand Order ¶ 10.  At some point early in the second semester, an intervention plan was implemented, which apparently was standard procedure for students at risk of retention.[14]  AR 2210.  In the spring of 2004, E.M. scored at the

_____

[13] Plaintiffs take issue with the fact that the ALJ used the phrase "in hindsight" as an admission that a duty was triggered.  However, hindsight analysis is of limited import.  *See JG v. Douglas County Sch. Dist.*, 552 F.3d 786, 801 (9th Cir. 2008) ("We consider the IEP at the time of its implementation, not in hindsight, and ask if its methods were reasonably calculated to confer an educational benefit on the child."); *Fuhrmann v. East Hanover Bd. of Educ.*, 993 F.2d 1031, 1040 (3d Cir. 1993) ("the measure and adequacy of an IEP can only be determined as of the time it is offered to the student, and not at some later date.").  More importantly, when viewed in its entirety, the evidence presented to the Court does not support Plaintiffs' claim of a procedural violation.  Perhaps the ALJ should have said "in isolation" rather than "in hindsight."

[14] E.M.'s promotion to the fifth grade weighs slightly in favor of finding that PVUSD fulfilled its obligations; although grade-to-grade advancement is a factor to consider, *see Rowley*,

Case No. C 06-4694 JF
ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ETC.
(JFLC1)

basic level in English-language skills and just below basic in math in the standardized tests.  AR

1816.  The results of the intervention are not evident from the grade report in the record, as it

appears that the report was for the third quarter.  AR 1812 (the last entry being dated March 3,

2004).  In addition, from an IEP referral form signed by Ms. Audet in August 2004, which

presumably was generated while PVUSD was in the process of responding to Dr. Wright's

report, *see* AR 1497-98, it appears that the interventions produced largely "limited" results.  AR

2222.  If the grade report and IEP referral form are viewed in isolation, PVUSD may have had

reason to suspect a learning disability by the second half of E.M.'s fourth grade year, thereby

triggering a duty to assess.  However, the record also contains extensive testimony from Ms.

Audet, and this testimony paints a different picture.  The ALJ appears to have rested his decision

on this testimony:

> Susan Audet did not suspect that [E.M.] had a learning disability
> and did not refer him for an assessment.  Ms. Audet believed that
> [E.M.] was a "passive" learner and that he generally lacked
> motivation.  [E.M.] was in the average range as compared to the
> other thirty-one to thirty-three students in her fourth-grade class.
> [E.M.] did not fail to complete his homework because he was
> unable to complete the assignments.  Rather, [E.M.] played video
> games after school in lieu of completing his homework.  Overall,
> [E.M.]'s classroom participation was average.  He did well in
> geometry, a subject he enjoyed. [E.M.] did not have difficulty
> understanding multiple directions, and although he as distractible,
> he was not more distractible than numerous other Students in his
> general education fourth-grade class, including some children who
> were receiving special education and related services.

AL Remand Order ¶ 11.

Viewed in its entirety, the evidence presents a relatively close question.  PVUSD may

have had some reason to suspect that E.M.'s difficulties were caused by something other than a

mere lack of motivation, notwithstanding Ms. Audet's testimony to the contrary.  However, the

point at which this duty would have been triggered, if at all, is unclear from the record, as

PVUSD had an obligation to attempt regular-classroom intervention before initiating a formal

---

458 U.S. at 203 n.25, E.M.'s progression was conditional on his attendance at summer school.
Likewise, the probative value of the retention notice is reduced by the fact that Ms. Audet
testified that up to half of her students were retention risks.  AR 1457.

1   assessment. *See Hood*, 486 F.3d at 1158 (no requirement of special education benefits where

2   "any existing severe discrepancy between ability and achievement appears correctable in the

3   regular classroom"). *See also* ALJ Remand Order ¶ 14a.

4        The Court also affirms the ALJ's findings with respect to the period from August 2004 to

5   the present.  PVUSD responded in a timely fashion after being notified of Dr. Wright's report.  In

6   addition, "among the most important procedural safeguards are those that protect the parents'

7   right to be involved in the development of their child's educational plan." *Amanda J. ex rel.*

8   *Annette J. v. Clark County School Dist.*, 267 F.3d 877, 882 (9th Cir. 2001).  The record reflects

9   that E.M.'s teachers communicated with his mother on a regular basis.  PVUSD responded to her

10  heightened concerns in light of Dr. Wright's report by proceeding with a formal assessment.  Dr.

11  Wright's report was considered during the assessment process, and the WISC-III score from Dr.

12  Wright's testing was used in PVUSD's assessment.[15]  E.M.'s mother participated in the IEP

13  meetings, and on at least one occasion she brought a friend who also happened to be involved in

14  education.

15       To summarize, the decision of the ALJ with respect to PVUSD's fulfillment of its child-

16  find obligations during the 2002-2003 school year and as to the issue of whether Dr. Wright's

17  report received adequate consideration is affirmed.  As discussed in further detail below, any

18  failure to assess during the 2003-2004 year was harmless error because E.M. did not have a

19

20           [15] As the ALJ stated:

21              If the parent or guardian obtains an independent educational assessment a
                district is required to consider the assessment.  An LEA's failure to
22              consider a parent's assessment is a procedural violation which may result
                in a FAPE denial under certain circumstances…the District considered Dr.
23              Wright's assessment.  When the District conducted its own assessment, it
                prepared a Notice of Referral and Proposed Action form.  The form
24              indicates that Dr. Wright's assessment, in part, led to the District's
                decision to assess [E.M.].  Moreover…School Psychologist Leslie Viall
25              included Dr. Wright's scores in her own assessment results, and she used
                Dr. Wright's scores in her analysis regarding whether or not [E.M.]
26              displayed a severe discrepancy between ability and achievement.
27
28  ALJ Remand Order ¶¶ 21a-b.

Case No. C 06-4694 JF
ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ETC.
(JFLC1)

1    disability as defined by IDEA.  *See R.B.*, 496 F.3d at 942 ("A child ineligible for IDEA

2    opportunities in the first instance cannot lose those opportunities merely because a procedural

3    violation takes place.").

4           C.  Disability Determination

5                  1.  Diagnostic Test Data

6           Plaintiffs' primary contention throughout the entire administrative review process has

7    been that PVUSD (and subsequently the ALJ) failed to consider the results of certain diagnostic

8    tests that demonstrated E.M.'s eligibility for special education services.  *See* ALJ Remand Order ¶

9    23.  Specifically, Plaintiffs contend that E.M. suffers from an auditory processing disorder, and

10   that this disorder is evident from the significant difference between E.M.'s composite K-ABC

11   ability score and his WJ-III achievement scores.  During the relevant period in question,

12   applicable California law provided as follows:

> A pupil shall be assessed as having a specific learning disability
> which makes him or her eligible for special education and related
> services when it is determined that all of the following exist:
>
> (a) A severe discrepancy between the intellectual ability and
> achievements in one or more of the following academic areas: (1)
> oral expression; (2) listening comprehension; (3) written
> expression; (4) basic reading skills; (5) reading comprehension; (6)
> mathematics calculation; (7) mathematics reasoning.
>
> (b) The discrepancy is due to a disorder in one or more of the basic
> psychological processes and is not the result of environmental,
> cultural, or economic disadvantages.
>
> (c) The discrepancy cannot be corrected through other regular or
> categorical services offered within the regular instructional
> program.

22   Cal. Educ. Code § 56337 (2005).  As used in subsection (a), a severe discrepancy is measured

23   either through (1) a formula using standardized tests, (2) alternative means when standardized

24   tests are considered invalid, or (3) through a determination by an IEP team that such a

25   discrepancy exists.  Cal. Code. Regs. tit. 5, § 3030(j)(4)(A)-(C).

26          As discussed previously, PVUSD's assessment team decided to use E.M.'s WISC-III

27   score, rather that the K-ABC score.  The ALJ concurred in this decision, and on remand he

28   explained his reasoning as follows:

                                        19

[T]he evidence, and particularly the testimony of Ms. Viall, established that the WISC-III performance score of 104 is a better measure of [E.M.]'s cognitive ability than his K-ABC score of 111 because the WISC-III score was corroborated by another measure, the TONI (98). Ms. Viall, who testified that the WISC-III performance score was the best measure of [E.M.]'s cognitive ability, was a credible witness. Her analysis was thorough and careful and her report was detailed, factual and balanced. She persuasively explained why she administered the K-ABC (because [Dr. Wright] had so recently administered the WISC-III). When she obtained a score that was discrepant from the WISC-III obtained by Dr. Wright, she administered another assessment that corroborated Dr. Wright's performance score on the WISC-III. Ms. Viall reasonably determined that the TONI and WISC-III scores were consistent and average. And still, she utilized the highest score on the WISC-III ([E.M.]'s Full Scale score on the WISC-III, according to Dr. Wright's assessment, was a 95)…

Ms. Viall's testimony was more persuasive than Dr. Wright's regarding what score should be used by the IEP team because of her background and experience as a school psychologist who regularly applies special education concepts in her work. Dr. Wright's testimony revealed that he [sic] did not have a working familiarity with many basic special education concepts…

[E.M.] failed to present a detailed, thorough, fair or balanced analysis from any witness regarding why the second highest composite score on the K-ABC should be used to determine whether [E.M.] had a severe discrepancy. Dr. Wright never explained why the K-ABC should be used. Rather, Dr. Wright's testimony supported the efficacy of the WISC-III.

ALJ Remand Order ¶¶ 30a-30c.

The ALJ's findings are supported adequately by the testimony of Ms. Viall. When asked about her decision to use the WISC-III performance score (which was higher than E.M.'s WISC-III full scale score), Ms. Viall stated that "I feel the WISC is a test of choice and it showed consistency with the TONI, and [I] didn't use the full scale score because of [E.M.]'s bilingual background, so it seemed more valid to use the performance score." AR 1235. With respect to the K-ABC, Ms. Viall testified that she felt that E.M.'s score was "inflated" because it was not consistent with the WISC-III or TONI scores, and she also testified that she no longer used the K-ABC because she had found that the test failed to provide "good information for looking at students' processing." AR 1235-36. Ms. Viall had conferred with other educators, who had confirmed the possibility of inflated K-ABC scores, and at the time of the due process hearing she believed that "the WISC is much more researched and much more reliable and valid

Case No. C 06-4694 JF
ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ETC.
(JFLC1)

measure." AR 1270.  In addition, E.M.'s bilingual background was a factor, as "the [K-ABC] is not specifically normed on a student with [a] Hispanic background, bilingual background, so I would want to look cautiously at those results." AR 1280.  This Court concludes that Viall's analysis was not unreasonable, nor was her decision to use the WISC-III score as opposed to the K-ABC.  In addition, the ALJ was entitled to discount the testimony of Dr. Wright to a certain extent, not only because Dr. Wright did not observe E.M. in the classroom, review his school records, or speak with his teachers, but also because her assessment was intended to serve an entirely different purpose, namely a finding of eligibility under the ADA that would be relevant to the family's immigration proceedings.[16]  The ALJ specifically found the testimony of Ms. Viall to be more credible than that of Dr. Wright.  After reviewing the testimony and the reports prepared by those two witnesses, as well as the specific reasoning set forth in ¶¶ 24-26 of the ALJ Remand Order, the Court concludes that this credibility determination is entitled to deference.

Ironically, PVUSD relied upon diagnostic scores provided by Plaintiffs' outside evaluator, while Plaintiffs claim that the district should have used its own K-ABC scores.  At best, the diagnostic results are ambiguous, which precludes Plaintiffs from prevailing on this issue as they have the burden of proof.  In addition, Dr. Wright's initial report praised the WISC-III, acknowledging that "[a]lthough there are numerous measures of children's intelligence, the Wechsler scales remain by far the most popular.  Even in assessing bilingual children and limited English-speaking students, the WISC was reported to be the most frequently used test."  AR 1821 (citations omitted).  The evidence presented to the contrary, including a declaration from Dr. Kaufman, the inventor of the K-ABC, does not require an opposite conclusion, as Dr. Kaufman would be expected to favor his own diagnostic measure.  Accordingly, the Court concludes that the ALJ's determination that the "similarity of the [TONI 98 score and WISC-III 104 score] both provided scores in the average range, and the similarity of the scores presented

---

[16] With respect to the impact of in-class observations, teacher interviews, and school records, Dr. Wright admitted unequivocally that such data would present a "more accurate picture" of a student's ability.  AR 1088-89.

21

1    an accurate measure of Student's ability" was not unreasonable.  *See* ALJ Remand Order ¶ 30e.

2    Ultimately, Plaintiffs' argument rests upon the conclusion that the K-ABC score was the correct

3    score to use.[17]  However, school districts have discretion with respect to their choice of

4    diagnostic test to determine special education eligibility, *see Ford*, 291 F.3d at 1088-89, and

5    Plaintiffs have not shown that the K-ABC score should have been used in lieu of other testing

6    criteria.

7        Plaintiffs also argue that PVUSD and the ALJ considered only the WISC-III score as the

8    dispositive indicator of eligibility for special education services, to the exclusion of other test

9    scores and qualitative indicators such as report card comments and anecdotal testimony provided

10   by E.M.'s teachers.  If this allegation were true, it would violate the statutory requirement that

11   "no single measure or assessment [should be] used as the sole criterion for determining whether a

12   pupil is an individual with exceptional needs or determining an appropriate educational program

13   for the pupil."  Cal. Educ. Code § 56320(e).  However, the ALJ correctly acknowledged that the

14   use of only a single measure in an assessment is not permitted, and found that PVUSD in fact had

15   used "three measures, the K-ABC, WISC-III, and the TONI, to determine [E.M.]'s intellectual

16   ability, the starting point in the determination of whether a pupil exhibits the requisite severe

17   discrepancy between ability and achievement."  *Id.* ¶ 30e. In addition, and as discussed in some

18   detail above, the district administered multiple tests to E.M., and used the totality of those results

19   to arrive at its ultimate determination of ineligibility.[18]

20

21       [17] Plaintiffs' representation that PVUSD initially "relied" on the K-ABC scores is not
22   supported by the record, as the cited handwritten notes (AR 1864) are indecipherable.

23       [18] While no authority was presented on this point, E.M.'s bilingual status could have
24   played at least some role his delayed performance, as some of the testing indicated that E.M.
     performed at a higher level when the administration was performed in Spanish.  In addition, Dr.
25   Wright's July 2004 report notes that a it takes a second-language speaker an additional five to
     seven years "to develop age-appropriate academic language." AR 1825.  *See also* AR 1101.  Dr.
26   Wright made that statement in the context of arguing that E.M.'s family should not be deported
     to Mexico because Spanish purportedly was E.M.'s second language.  However, there is
27   significant contrary evidence suggesting that English is E.M.'s second language.  A discrepancy
     resulting from a language barrier may have constituted a separate bar under the former Cal. Educ.
28   Code § 56337(b), which stated that a severe discrepancy cannot form the basis for a finding of

22

1          <u>2.  Observational and Anecdotal Evidence</u>

2          "California Special Education Hearing Office opinions…indicate the importance of

3    grades and educators' assessments when determining whether a child with a severe discrepancy

4    between his ability and achievement is reaping some educational benefit in the general

5    classroom."  *Hood*, 486 F.3d at 1007.  Plaintiffs argue that an objective review of non-statistical

6    data such as classroom observation and report cards supports their claim that PVUSD had a duty

7    to intervene under IDEA.

8          When viewed as a whole, the observational and anecdotal evidence describes a student

9    who was distracted easily but who also responded to various forms of classroom intervention.  If

10   E.M. had been able to complete assignments and homework on a more consistent basis, it seems

11   likely that he would have been a consistently average to above-average performer.  In fact, Ms.

12   Audet, who had ten years of relevant teaching experience at the time of the due process hearing,

13   testified that E.M. was an average student and a "much higher performer" than any of the special

14   education children in her classroom.  AR 1456.  While she had made special education referrals

15   "all the time," she never considered E.M. a candidate for referral.  AR 1456-57.  Moreover, while

16   E.M. was designated as being at risk for retention, Ms. Audet noted that approximately half the

17   students in her classes are designated as being at risk for retention, and that there was no

18   significant correlation between an at-risk designation and a special-education referral.  AR 1457.

19   She noted that putting E.M in small-group situations appeared to aid with some of his

20   distractibility issues.  AR 1465.  PVUSD was not obligated to provide E.M. with the best

21   education possible.  Indeed, the Ninth Circuit "has emphasized that 'states are obligated to

22   provide "a basic floor of opportunity" through a program "individually designed to provide

23   educational benefit to a handicapped child,'" rather than 'potential-maximizing' education."

24   *Hood*, 486 F.3d at 1107 (quoting *Ash v. Lake Oswego Sch. Dist., No. 7J*, 980 F.2d 585, 587 (9th

25

26

27   ────────────────

28   eligibility for special education if the discrepancy is "the result of environmental, cultural, or
     economic disadvantages."

1   Cir. 1992)).[19]

2          Plaintiffs argue that the instant case is not about a simple lack of motivation or a failure to

3   turn in homework, citing *M.P. v. Santa Monica Malibu Unified Sch. Dist.*, No. CV 07-03393,

4   2008 WL 2783194 (C.D. Cal. July 16, 2008).  In *M.P.*, the ALJ concluded that a student failed to

5   qualify for benefits primarily because his academic deficiencies resulted from a lack of

6   motivation rather than any learning disability as defined by IDEA.  *See id.* at *10-11.  The district

7   court rejected "the ALJ's conclusion that Petitioner's academic problems stem from lack of

8   motivation rather than his learning disability," and instead found that the inability to complete

9   work was a symptom, rather than the cause, of the child's poor academic performance.  *Id.* at

10  *10-11.  In that case, however, there was no dispute that the child suffered from ADHD.  *See id.*

11  at *11 ("everyone agrees that M.P. has ADHD, that he is distracted at school, lacks focus, has

12  difficulty completing independent work, and that his grades suffer significantly as a result.

13  Everyone agrees that this behavior manifests itself as a lack of motivation.").  *See also W.H.*, at

14  *21 ("Student undisputedly has ADHD.  He also has a psychological processing disorder, a speed

15  processing disorder, and oppositional disorder.").  In contrast, in the instant case the parties

16  dispute strenuously whether E.M.'s apparent lack of focus and failure to turn in homework are

17  caused by a lack of motivation or instead by some fundamental physiological issue.  On this

18  point, the ALJ concluded that "[E.M.] did not fail to complete his homework because he was

19  unable to complete the assignments.  Rather, [he] played video games after school in lieu of

20  completing his homework."  ALJ Remand Order ¶ 11.  While this finding arguably

21  oversimplifies the underlying cause, the point is relevant to the apparent correctability of the

22  problem.

23         In addition, the student in *M.P.* performed more poorly than his peers, such performance

24  was a direct result of his ADHD, and classroom intervention had failed to provide any relief.  *See*

25

26

27  [19] The Ninth Circuit has rejected Plaintiffs' contention that relative performance is of
    little import.  While relative performance cannot be used to the exclusion of any consideration of
    individualized performance, "[school] districts may consider a student's relative performance as
28  one factor in an eligibility inquiry."  *Hood*, 486 F.3d at 1106.

24

1   *M.P.*, 2008 WL 2783194, at *12-13 ("the evidence does not support the ALJ's finding that

2   modification of the general educational curriculum alone will alleviate the academic problems

3   brought on by ADHD.").  In the instant case, the ALJ's ruling contains factual findings that

4   distinguish this case from *M.P.*, in that "classroom interventions such as placing [E.M] in front of

5   the class and repeatedly conferring with parents…enable[d] [E.M.] to progress in the general

6   education curriculum without special education."  ALJ Remand Order LC ¶ 14.

7       Where academic issues can be "corrected through other regular or categorical services

8   offered within the regular instructional program," Cal. Educ. Code §56337, there is no obligation

9   to find that the student has a learning disability.  *See Hood*, 486 F.3d at 1106 ("even assuming the

10  existence of a severe discrepancy, the law does not entitle [a student] to special education if we

11  find that her discrepancy can be corrected in the regular classroom.").  *See also R.B.*, 496 F.3d at

12  946 ("California school districts commonly turn to behavioral support plans as alternative

13  remedies for students who do not satisfy the IDEA's criteria"); ALJ Remand Order LC ¶ 14a.

14  Moreover, the use of regular classroom-based intervention was "consistent with the concept of

15  mainstreaming, an objective that the school district is legally bound to pursue."  *Hood*, 486 F.3d

16  at 1110 (citing 20 U.S.C. § 1412(a)(5)).  Accordingly, Plaintiffs have not met their burden of

17  showing that PVUSD made an improper assessment.

18      D.  Assessment in Additional Areas of Suspected Disability

19      Plaintiffs also allege that PVUSD failed to perform assessments "in all areas related to the

20  suspected disability," *see* Cal. Educ. Code § 56320(f), in particular assessments with respect to

21  E.M.'s auditory processing, hearing and behavior.  However, the record indicates that at least one

22  auditory processing test was administered by Ms. Viall during the initial assessment.  AR 1221-

23  22.  At the due process hearing, Ms. Viall testified that E.M. did not appear to suffer from

24  auditory processing difficulties because he started tasks immediately when given oral

25  instructions, and the WISC-III assessment had not shown a processing disorder.  AR 1219; 1240.

26  She also noted that a student with an auditory processing disorder probably would not be reading

27  at grade level, because auditory ability is essential to the development of reading skills, *see* AR

28  1242-43.  As Ms. Viall stated during her testimony, the fact that E.M had progressed to an A-

1    level student in certain academic areas, as well as his improvement in standardize math skills to

2    the basic level, are highly probative of an ability to succeed in the regular classroom

3    environment. *See* AR 1241.

4         Ms. Navarro also conducted the Brigance test in both Spanish and English as part of the

5    initial assessment, and this test arguably addresses auditory processing through a subtest

6    involving sentence repetition. AR 1363; 1370. In the English version of the Brigance test, E.M.

7    scored slightly below the grade level norm, but in Spanish his score was within the norm. AR

8    1370-71. Ms. Navarro testified that these scores did not raise a concern because variances

9    between are common for bilingual students. AR 1371. Ms. Navarro also testified that E.M. did

10   not display any apparent auditory limitations with respect to the reading comprehension

11   component of her assessment. AR 1372 ("some of my children with language disorders will

12   have a difficult time understanding…the question I'm asking about the story, and a difficult time

13   responding in complete sentences or good sentences. [E.M.] didn't have any problems.").

14        In her spring 2005 assessment, Ms. Nakanishi assessed E.M.'s "articulation, his voice, his

15   fluency, and his pragmatics," in both English and Spanish. AR 1516. She testified that the test

16   results did not raise any concern with respect to a potential auditory disorder because E.M.'s test

17   performance had been "high." AR 1527. In addition, the testing occurred in a relatively noisy

18   environment. *Id*. On a few of the English-language subtests, E.M.'s scores were "somewhat

19   low," but on the Spanish versions his test results were within the normal range. AR 1528. Ms.

20   Nakanishi stated that the discrepancy between the two versions was "indicative of there not being

21   a language problem. It's more suggestive of there being maybe an English-learning situation

22   rather than a language disability." *Id*. Even the results from the private assessment in November

23   2005 are inconclusive, as revealed by Dr. Kaspar's and Dr. Winzelberg's conflicting testimony at

24   the due process hearing. Accordingly, the ALJ correctly concluded that PVUSD performed

25   adequate auditory testing and that such testing did not indicate a learning disability. See ALJ

26   Order ¶ 19.

27        The ALJ's revised conclusions also are appropriate with respect to E.M.'s hearing and

28   behavioral assessments. The initial assessment report shows that E.M. passed a hearing

1   screening within a year of the assessment.  AR 270 ¶ 34; 2240.  In addition, the evaluation of

2   E.M.'s auditory processing skills presumably would have exposed related hearing issues, as an

3   auditory processing disorder occurs "where a student has difficulty discriminating between the

4   sounds that he hears or difficulty understanding what he hears or difficulty holding on to the

5   information that he hears.  AR 1242.  *See also* AR 806 (Dr. Kaspar's description of testing); AR

6   1646-49 (testimony of Dr. Winzelberg).  With respect to behavioral issues, E.M. did not exhibit

7   any disruptive behavior, and classroom intervention had been effective at improving his

8   distractibility.  *See* AR 2241-2242.  Accordingly, Plaintiffs did not meet their burden of showing

9   that the district had a duty to conduct further assessments of E.M. in the areas of hearing or

10   behavior.

11         E.  Decision by ALJ to Strike Claim for ADD/ADHD Assessment

12         Plaintiffs also argue that the ALJ improperly struck allegations that PVUSD failed to

13   assess E.M. for attention deficit disorder ("ADD") or attention deficit-hyperactivity disorder

14   ("ADHD").  The operative complaint in the underlying due process proceeding did not allege

15   such a failure specifically, although some of the facts alleged therein could be indicative of ADD

16   or ADHD.  The Court concludes, however, that the operative complaint did not contain sufficient

17   allegations of attention deficit disorder to provide notice of such an issue to PVUSD prior to the

18   hearing.  Moreover, the failure to show that a severe discrepancy existed during the period in

19   question renders the presence of any disorder irrelevant under IDEA.  *See Hood*, 486 F.3d at

20   1110 (existence of disorder irrelevant if student cannot meet requirements set forth in Cal. Educ.

21   Code § 56337); *Kelby v. Morgan Hill Unified Sch. Dist.*, 959 F.2d 240, at *3 (9th Cir. 1992) ("a

22   student has a specific learning disability if three factors exist: a relevant 'severe discrepancy'

23   between ability and achievement, the discrepancy must result from a disorder in a psychological

24   process, and the discrepancy must not be correctable through regular education.") (citing Cal.

25   Educ. Code § 56337).

26                   **IV.  ORDER**

27         E.M. exhibited an average to slightly below average academic ability, and may have

28   encountered difficulties early on because he was bilingual.  He responded to classroom

27

intervention, and he excelled once he arrived at a new middle school.  In addition, the record reflects that PVUSD officials and teachers were involved actively in E.M.'s education, and they uniformly believed that E.M. was not a proper candidate for referral for special education services.  The policies and actions of school officials generally are entitled to deference, and reviewing courts should not "substitute their own notions of sound educational policy for those of the school authorities which they review." *Rowley*, 458 U.S at 206.  *See also Smith*, 15 F.3d at 1524 ("deference [should be given] to the policy decisions of a school district when it is acting within the bounds of federal and state law.").  Most dispositive here is the fact that Plaintiffs failed to establish the existence of a learning disability during the period in question.

Accordingly, IT IS HEREBY ORDERED that PVUSD's motion for summary judgment affirming the decision by the ALJ is GRANTED, and the ALJ Remand Order is AFFIRMED.  E.M.'s cross-motion for summary judgment is DENIED.[20]

DATED: August 27, 2009

_____
JEREMY FOGEL
United States District Judge

---

[20] At oral argument on the initial round of motions, the Court ruled on a motion to strike and several requests for judicial notice.  The Court (1) granted Plaintiffs' motion to strike portions of PVUSD's expert declaration with respect to statements made by Dr. Jerome Sattler as well as an attached press release regarding Dr. Sattler; (2) granted Plaintiffs' motion to supplement the expert declaration of Dr. Kaufman but denied their motion to supplement as to the exhibits attached to the supplemental declaration; (3) granted Plaintiffs' request for judicial notice of an administrative law decision; and (4) denied Plaintiffs' remaining requests for judicial notice, with the understanding that the Court will take judicial notice of the actual DSM-IV manual.

28

1   This Order has been served upon the following persons:

2

3   Sarah Fairchild      sfairchild@leighlawgroup.com, sjfairchild@earthlink.net

    Rebecca Phillips Freie      RFreie@cde.ca.gov, JSpitz@cde.ca.gov

4   Howard Alan Friedman      hfriedman@fagenfriedman.com, astarcks@fagenfriedman.com

5   Mandy G Leigh, NA      mleigh@leighlawgroup.com, jambeck@schinner.com;
    sfairchild@leighlawgroup.com

6   Laurie E. Reynolds      lreynolds@fagenfriedman.com, tdavies@lozanosmith.com

7   Kimberly Anne Smith      ksmith@fagenfriedman.com, cperez@fagenfriedman.com

8   Peter Marshall Williams      Peter.Williams@doj.ca.gov, Jo.Farrell@doj.ca.gov

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Case No. C 06-4694 JF
ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ETC.
(JFLC1)