United States District Court
For the Northern District of California

1

2

3

4

5

6

7

8                         IN THE UNITED STATES DISTRICT COURT

9                      FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11   E.M., a minor, by and through his parents,        No. C-06-4694 MMC
     E.M. and E.M.,
12                                                      **ORDER GRANTING JUDGMENT IN**
                    Plaintiff,                          **FAVOR OF DEFENDANT**
13
        v.
14
     PAJARO VALLEY UNIFIED SCHOOL
15   DISTRICT,

16                  Defendant.
     _____/
17

18          Before the Court is plaintiff E.M.'s Brief on Remand, filed December 2, 2011.

19   Defendant Pajaro Valley Unified School District ("PVUSD") has filed a response, to which

20   E.M. has replied.  The matter came on regularly for hearing January 20, 2012.  Mandy G.

21   Leigh of the Leigh Law Group appeared on behalf of E.M.  Kimberly A. Smith of Fagen

22   Friedman & Fulfrost, LLP, appeared on behalf of PVUSD.  Having read and considered the

23   parties' respective written submissions,[1] including the administrative record lodged with the

24   Clerk of the Court on December 6, 2011, and having considered the arguments made at

25   the hearing, the Court rules as follows.

26   //

27

28          [1]PVUSD's objections to portions of E.M.'s reply are hereby OVERRULED, and
     E.M.'s motion to strike PVUSD's sur-reply is hereby GRANTED.

**BACKGROUND**

E.M. is a minor who was enrolled as a student in PVUSD schools beginning in 1999, when he enrolled in kindergarten, and ending in 2008, when his family moved to another district.  E.M. alleges he is a disabled student who, pursuant to the Individuals with Disabilities Education Act ("IDEA"), was entitled to receive special education services while he was enrolled in PVUSD schools.

In 2004 and in 2005, PVUSD found E.M. was not eligible for special education.  (See Administrative Record ("AR") 267.)  Thereafter, on December 5, 2005, E.M. filed a "due process" complaint with the Office of Administrative Hearings (see AR 1-16), which, as amended January 4, 2006 (see AR 59-78), alleged he was eligible for special education under the IDEA "as a child primarily with a learning disability and also as a child as having an other health impairment due to his auditory processing deficits" (see AR 73).  In a pre-hearing filing, E.M. additionally alleged the PVUSD failed to comply with the IDEA by not assessing him for "attention deficit disorder" ("ADD") and "attention deficit hyperactivity disorder" ("ADHD").  (See AR 122, 177.)  At a pre-hearing conference, the administrative law judge ("ALJ") struck, on untimeliness grounds, E.M.'s ADD/ADHD allegations (see AR 177), and, after conducting a six-day evidentiary hearing, issued a decision finding E.M. had failed to establish he had a "specific learning disability" (see AR 263, 274), and, consequently, found he was not entitled to special education services under the IDEA (see AR 263).[2]

On August 2, 2006, E.M. filed the instant action.  In the operative complaint, the Second Amended Complaint ("SAC"), filed June 12, 2008, E.M. alleges that the ALJ "wrongly decided the case" (see SAC ¶ 56), that E.M. "had an auditory processing disorder" (see SAC ¶ 27), that PVUSD staff and E.M.'s parents"thought [he] had ADD/ADHD" (see SAC ¶ 47), and that E.M. was entitled to "special education and related services under the eligibility category of SLD [specific learning disability]" and "under other eligibility

---

[2]The ALJ did not expressly decide whether E.M. had an "other health impairment" that would make him eligible for special education.

1  categories" (see SAC ¶¶ 43, 44).

2       On October 17, 2008, the Honorable Jeremy Fogel, the district judge to whom the

3  matter was then assigned, remanded the matter to the ALJ.  Specifically, Judge Fogel

4  found certain of the ALJ's findings of fact and conclusions of law were conclusory, and

5  directed the ALJ to "set forth more completely his reasoning."  (See Order, filed October 17,

6  2008, at 5.)  On May 29, 2009, the ALJ issued a Decision Following Remand, in which the

7  ALJ more completely set forth the basis for his reasoning.[3]  On August 27, 2009, following

8  additional briefing by the parties, Judge Fogel granted PVUSD's motion for summary

9  judgment and denied E.M.'s motion for summary judgment.  In particular, Judge Fogel

10  found E.M. failed to show he had a specific learning disorder and that the ALJ had not

11  erred by striking E.M.'s ADD/ADHD allegations.  Judgment subsequently was entered in

12  favor of PVUSD.

13       On July 14, 2011, the United States Court of Appeals for the Ninth Circuit affirmed in

14  part and reversed and remanded in part.  See E.M. v. Pajaro Valley Unified Sch. Dist., 652

15  F.3d 999 (9th Cir. 2011).  Specifically, the Ninth Circuit affirmed Judge Fogel's decision

16  granting summary judgment to PVUSD on E.M.'s claim that he "qualified for special

17  education and related services as a child with ADD/ADHD," see id. at 1007, reversed

18  Judge Fogel's finding that E.M. had failed to show he had a specific learning disability, with

19  directions to reconsider said finding after "consider[ing]" whether two reports created after

20  the administrative hearing were admissible, see id. at 1006, and further directed the district

21  court to determine E.M.'s claim that his "auditory processing disorder diagnosis qualified

22  him for special education as a child with an 'other health impairment,'" see id. at 1006-07.[4]

23       On remand, the matter was reassigned to the undersigned, and the parties

24  subsequently filed briefs to address the issues identified by the Ninth Circuit.

25

26      [3]The Decision Following Remand is filed in the instant action as Document No. 132.

27      [4]With respect to the "other health impairment" claim, the Ninth Circuit found E.M.

28  had not waived the claim, that the ALJ "apparently ignored" it, and that Judge Fogel "did not
consider it."  See id. at 1006.

**STANDARD OF REVIEW**

"In evaluating a complaint under the IDEA, the district court shall receive the record of the [state] administrative proceedings, shall hear additional evidence at the request of a party, and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." Seattle School Dist., No. 1 v. B.S., 82 F.3d 1493, 1499 (9th Cir. 1996) (alteration in original; internal quotation and citation omitted).  "The Ninth Circuit has interpreted [the IDEA] as calling for de novo review." Id.  "[I]t has cautioned," however, that the district court "must give deference to the state hearing officer's findings, particularly when . . . they are thorough and careful." Id.  "[C]ourts are not permitted simply to ignore the administrative findings." Ojai Unified Sch. Dist. v. Jackson, 4 F.3d 1467, 1474 (9th Cir. 1993) (internal quotation and citation omitted), cert. denied, 513 U.S. 825 (1994).

E.M. challenges the findings made by the ALJ, and, accordingly, has the burden of establishing his entitlement to relief under the IDEA. See Hood v. Encinitas Union Sch. Dist., 486 F.3d 1099, 1103 (9th Cir. 2007) ("The burden of proof in the district court rest[s] with the . . . party challenging the administrative decision.").

**DISCUSSION**

Under the IDEA, a state must provide a "free appropriate public education" to children with disabilities.  See 20 U.S.C. § 1412(a)(1)(A).  A state must, inter alia, identify and evaluate children with disabilities, see 20 U.S.C. § 1412(a)(3)(A), and develop an "individual education program" for each disabled child, see 20 U.S.C. § 1412(a)(4).

"The term 'child with a disability' means a child --

(i) with intellectual disabilities, hearing impairments (including deafness), speech or language impairments, visual impairments (including blindness), serious emotional disturbance (referred to in [the IDEA] as 'emotional disturbance'), orthopedic impairments, autism, traumatic brain injury, other health impairments, or specific learning disabilities; and

(ii) who, by reason thereof, needs special education and related services. "

See 20 U.S.C. § 1401(3)(A) (emphasis added).

E.M. alleges PVUSD failed to properly identify and evaluate him as a child with a

disability.  In particular, E.M. alleges he has an auditory processing disorder, and that, as a result of the effects thereof, he was entitled to special education services under the categories of "specific learning disability" and/or "other health impairment."  As was discussed at the January 20, 2012 hearing, the Court finds, and counsel for the parties agree, the proper procedure for resolving the remaining claims is a bench trial on the record as discussed herein.  See, e.g., Ojai Unified Sch. Dist., 4 F.3d at 1472 (holding, where disputed issues of fact exist, IDEA claim must be resolved by "bench trial on a stipulated record").  Accordingly, the instant order sets forth below the Court's findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

At the outset, the Court addresses the Ninth Circuit's direction to consider whether a Psychological Assessment, written in December 2007 by Cheryl Jacques, Psy.D. ("Dr. Jacques' Assessment")[5] and a Report of Assessment for Special Education, written in February 2008 by a PVUSD "assessment team" ("PVUSD 2008 Assessment")[6] are "relevant, non-cumulative, and otherwise admissible."  See E.M., 652 F.3d at 1006.

Dr. Jacques' Assessment includes a finding that, in December 2007, a "severe discrepancy" existed between E.M.'s intellectual ability and academic achievements; as discussed below, whether such discrepancy existed in 2004 or 2005 is at issue in the instant case.  The PVUSD 2008 Assessment includes a finding that, in 2008, E.M. had a specific learning disability entitling him to special education services.  Although, as PVUSD points out, the findings in both Dr. Jacques' Assessment and the PVUSD 2008 Assessment are based on testing conducted after the administrative hearing, the Court finds the two assessments tend to shed some light on the nature of E.M.'s asserted impairments in 2004 and 2005, and, consequently, are relevant to E.M.'s remaining claims.  See Ojai Unified Sch. Dist., 4 F.3d at 1473 (holding district court has discretion to admit "evidence concerning relevant events occurring subsequent to the administrative hearing").  The

---

[5]Dr. Jacques' Assessment is filed as Exhibit B to E.M.'s Brief on Remand, and also as Exhibit A to the Declaration of Sarah Fairchild, filed February 21, 2008.

[6]The PVUSD 2008 Assessment is filed as Exhibit A to E.M.'s Brief on Remand.

1    Court further finds neither assessment is cumulative of evidence in the administrative

2    record; the assessments address testing and observations occurring after the

3    administrative hearing.  Lastly, PVUSD points to no reason, and the Court has found none,

4    suggesting the assessments, if relevant and non-cumulative, nonetheless are inadmissible.

5            Accordingly, the Court hereby grants E.M.'s request to supplement the record with

6    Dr. Jacques' Assessment and the PVUSD 2008 Assessment.  The Court next turns to the

7    merits of E.M.'s claims.

8    **A.  Specific Learning Disability**

9            **1.  Definition of Specific Learning Disability**

10           During the time period in which PVUSD made the determinations at issue herein, the

11   Code of Federal Regulations defined "specific learning disability" as follows:

12       (i) General. The term means a disorder in one or more of the basic
         psychological processes involved in understanding or in using language,
13       spoken or written, that may manifest itself in an imperfect ability to listen,
         think, speak, read, write, spell, or to do mathematical calculations, including
14       conditions such as perceptual disabilities, brain injury, minimal brain
         dysfunction, dyslexia, and developmental aphasia.
15
16       (ii) Disorders not included. The term does not include learning problems that
         are primarily the result of visual, hearing, or motor disabilities, of mental
17       retardation, of emotional disturbance, or of environmental, cultural, or
         economic disadvantage. "

18   See 34 C.F.R. § 300.7(c)(10) (2005).

19           During that same period, the California Education Code set forth the standards

20   applicable to a determination as to whether a student has a "specific learning disability,"

21   which standards the Ninth Circuit has found applicable in the instant action.  See E.M., 652

22   F.3d at 1003.  Under the applicable state law, "[a] pupil shall be assessed as having a

23   specific learning disability which makes him or her eligible for special education and related

24   services when it is determined that all the following exist:

25       (a) A severe discrepancy exists between the intellectual ability and achievements in
         one or more of the following academic areas:
26
27           (1) Oral expression.
             (2) Listening comprehension.

28

(3) Written expression.
(4) Basic reading skills.
(5) Reading comprehension.
(6) Mathematics calculation.
(7) Mathematics reasoning.

(b) The discrepancy is due to a disorder in one or more of the basic psychological processes and is not the result of environmental, cultural, or economic disadvantages.

(c) The discrepancy cannot be corrected through other regular or categorical services offered within the regular instructional program."

See Cal. Educ. Code § 56337 (2005).

### 2. Application

As noted, a "specific learning disability" exists when a pupil has a "disorder in one or more of the basic psychological processes" that causes certain specified effects.  See 34 C.F.R. § 300.7(c)(10) (2005); Cal. Educ. Code § 56337 (2005).  "Basic psychological processes include attention, visual processing, auditory processing, sensory-motor skills, cognitive abilities including association, conceptualization and expression."  Cal. Code Regs. tit. 5, § 3030(j)(1) (2005) (emphasis added).

As discussed below, although the Court finds E.M. has established he had, at the time PVUSD made the assessments challenged herein, an auditory processing disorder, i.e, a "disorder in one or more of the basic psychological processes," E.M. has failed to show he had a "specific learning disability" at that time.

### a.  Disorder in Basic Psychological Process

In its opinion, the Ninth Circuit "agree[d]" with E.M.'s argument on appeal that "the district court improperly concluded that he failed to establish that he suffered from a 'disorder in a basic psychological process,'" noting the administrative record contained evidence showing one audiologist had "diagnosed E.M. with an auditory processing disorder" and that a second audiologist "could not rule out an auditory processing disorder diagnosis."  See E.M., 652 F.3d at 1003.  The Court understands the Ninth Circuit to have ruled that, on the record before Judge Fogel, it was undisputed that E.M. had a "disorder in a basic psychological process," specifically, "an auditory processing disorder."  On remand,

1    this Court is bound by the Ninth Circuit's ruling.  See Insurance Group Comm. v. Denver &

2    R.G.W.R. Co., 329 U.S. 607, 612 (1947) ("When matters are decided by an appellate court,

3    its rulings, unless reversed by it or a superior court, bind the lower court.").

4            Assuming, however, the Ninth Circuit, as PVUSD argues, left the issue open for

5    reconsideration on remand,[7] the Court, having considered de novo the evidence in the

6    administrative record, finds E.M., during the time period in which PVUSD made the

7    determinations at issue, had an auditory processing disorder.  (See, e.g., AR 118-30,

8    1958).  This finding is further supported by the PVUSD 2008 Assessment, which includes

9    findings consistent with E.M.'s having an auditory processing disorder in February 2008

10   (see Pl.'s Brief on Remand Ex. A at 31),[8] and the record reflects no event occurring after

11   2004/2005 and before 2008, or any other evidence, indicative of a late onset of said

12   disorder.

13           Accordingly, the Court finds E.M. has a disorder in a basic psychological process,

14   specifically, an auditory processing disorder.  See Cal. Code Regs. tit. 5, § 3030(j)(1)

15   (2005).

16                       **b.  "Severe Discrepancy"**

17           As discussed above, a student is eligible for special education as a child with a

18   specific learning disability where "a 'severe discrepancy' . . . between the child's intellectual

19   ability and achievement in one or more of seven designated academic areas" exists.  See

20   E.M., 652 F.3d at 1003.

21   //

22   //

23   

24           [7]Because Judge Fogel found PVUSD was entitled to "summary judgment," the Ninth
     Circuit reviewed his findings "de novo."  See E.M., 652 F.3d at 1002.  Consequently, the
25   Ninth Circuit may have found that because the administrative record included evidence to
     support a finding that E.M. had an auditory processing disorder, a triable issue remained for
26   determination by the finder of fact.

27           [8]For example, the PVUSD 2008 assessment, in reference to testing done in early
     2008, noted that although E.M. had "very well developed word recognition/phonic skills
28   while reading," he exhibited "poor performance" on "auditory memory subtests administered
     without any visual cues/prompts."  (See id.)

The California Code of Regulations provides that a district "shall use" certain specified "procedures" to determine whether a child has the requisite "severe discrepancy." See Cal. Code Regs. tit. 5, § 3030(j)(4) (2005).  As correctly summarized by the ALJ, the state regulation in effect at the time of PVUSD's challenged assessments provided that a "severe discrepancy between ability and achievement is found when the difference in standard scores is at least 22.5 points . . ., adjusted by 4 points, which is one standard error of measurement."  (See Decision Following Remand at 15.)  "This computed difference constitutes a severe discrepancy when 'such discrepancy is corroborated by other assessment data which may include other tests, scales, instruments and work samples, as appropriate.'"  (See id. (quoting Cal. Code Regs. tit. 5, § 3030(j)(4)(A) (2005).)

When it assessed E.M. in 2004 and 2005, PVUSD found the requisite discrepancy did not exist.  After conducting an evidentiary hearing, the ALJ found PVUSD did not err in that regard, and, on judicial review, Judge Fogel likewise found no error by PVUSD.  On appeal, the Ninth Circuit observed that a "severe discrepancy" would have been found had the PVUSD used the results of another standardized intelligence test, as opposed to the results of the standardized test upon which PVUSD relied, and framed the issue as "whether PVUSD's choice among test scores was reasonable."  See E.M., 652 F.3d at 1004 (holding "a school district, considering all relevant material available on a pupil, must make a reasonable choice between valid but conflicting test results in determining whether a 'severe discrepancy' exists").  In light of the above-referenced unresolved issues as to the admissibility of the additional evidence, however, the Ninth Circuit did not reach the issue of whether PVUSD's choice among test scores was reasonable; rather, it remanded the matter for further consideration of that issue, which, as set forth below, this Court now addresses.

The ALJ concluded the appropriate "achievement" score to be used for purposes of the "severe discrepancy" analysis was E.M's "lowest standard score in any of the [relevant] academic areas" (see Decision Following Remand at 9), which score the ALJ found was E.M.'s "score of 87 on the 'auditory interpretation of directions' subtest" of a standardized

1    test administered by PVUSD in the fall of 2004 (see id. at 9-10).[9]  No party has disagreed

2    with the ALJ's finding on such issue, and the Court finds it proper to give deference thereto.

3           The appropriate "ability" score to be used for purposes of the "severe discrepancy"

4    analysis was a disputed issue before the ALJ, and remains disputed in district court.  As of

5    the time of the administrative hearing, E.M. had been given three standardized intelligence

6    tests and had received a different score on each test.  Specifically, he received (1) a score

7    of 104 on the Wechsler Intelligence Scale for Children - Third Edition ("WISC-III"), as

8    administered in July 2004 by Roslyn Wright, Psy.D. ("Dr. Wright"), who had been retained

9    by E.M.'s parents; (2) a score of 111 on the Kaufman Assessment Battery for Children ("K-

10   ABC"), administered in October 2004 by Leslie Viall ("Viall"), M.S., Psychology, a PVUSD

11   school psychologist; and (3) a score of 98 on the Test of Nonverbal Intelligence ("TONI"),

12   also administered by Viall.  (See id. at 7-8.)  E.M. argues the K-ABC score should have

13   been used, and relies on testimony provided by Dr. Wright at the evidentiary hearing, while

14   PVUSD, relying on the testimony provided by Viall, argues its decision to employ the

15   WISC-III score was reasonable.

16          The ALJ summarized the testimony provided on this issue, and explained why he

17   found Viall more persuasive than Dr. Wright, as follows:

18          School Psychologist Leslie Viall's testimony established that the performance
            score on the WISC-III of 104 is the valid measure of [E.M.'s] intellectual
19          ability.  Ms. Viall is a credentialed school psychologist with more than 15
            years experience administering educational assessments to children.  She
20          testified that the WISC is the most common intelligence quotient test
            administered to children, as well as the best predictor of school performance.
21          Ms. Viall administered the K-ABC when she assessed [E.M.] in October 2004
            only because the parents' assessor, Dr. Wright, had recently administered the
22          WISC-III.  If Ms. Viall had administered the WISC-III less than four months
            after Dr. Wright's administration, Ms. Viall would have obtained an invalid
23          score.  When Ms. Viall obtained a significantly higher score on the K-ABC
            (111), she administered another intelligence test, the [TONI,] to obtain more
24          information.  [E.M.'s] TONI score of 98 was consistent with [E.M.'s]
            performance score on the WISC-III, not the inflated score on the K-ABC.

25

26

27          [9]According to testimony given at the administrative hearing, the results of the subtest
     provide a "valid measure of a child's 'listening comprehension.'"  (See id. at 10.)  As noted,
28   "listening comprehension" is one of the "academic areas" identified in § 56337.

                                              10

Accordingly, Ms. Viall determined that 104 was the most reliable, valid measure of [E.M.'s] intellectual ability.

[E.M.'s] expert, Dr. Wright[,] testified that the K-ABC score of 111 was the appropriate measure of [E.M.'s] intellectual ability. Dr. Wright's testimony was not credible on this point. First, Dr. Wright never explained why the K-ABC score should be used instead of the WISC-III score she obtained. Indeed, her own report states that the performance score on the WISC-III was an accurate measure of [E.M.'s] "true cognitive potential." Second, as explained above, the WISC-III performance score was corroborated by the TONI score while the K-ABC score was not corroborated by any score or observation. Third, Dr. Wright's testimony was not generally credible because she made recommendations that were not supported by the facts and were clearly not within her area of expertise.

(See id. at 8-9.)

Finding Viall's testimony to be persuasive, the ALJ concluded that "the WISC-III performance score of 104 [was] a better measure of [E.M.'s] cognitive ability than his K-ABC score of 111." (See id. at 10.) Having selected the scores he determined to provide the most valid measures of E.M.'s ability and achievement (104 and 87, respectively), the ALJ concluded PVUSD had not erred in finding a "severe discrepancy" was not shown, because, as the ALJ observed, the difference between said scores was "17 points, far less than the requisite 22.5 points required by applicable law." (See id.)

This Court, having reviewed the record of the administrative hearing and the ALJ's Decision Following Remand, finds the ALJ's findings are properly characterized as "thorough and careful," and, consequently, entitled to deference. See R.B. v. Napa Valley Unified Sch. Dist., 496 F.3d 932, 942 (9th Cir. 2007).[10] Further, having conducted its own de novo review of the evidence in the administrative record, the Court finds E.M. has not met his burden to show it was unreasonable for PVUSD to use the WISC-III test score. Several different standardized tests were given to E.M., and differing results were obtained. Viall testified in detail as to why the K-ABC test result was the least reliable indicator of

---

[10]As the Ninth Circuit has held, a hearing officer's findings are "thorough and careful" where the hearing officer "participates in the questioning of witnesses and writes a decision containing a complete factual background as well as a discrete analysis supporting the ultimate conclusions." See id. (internal quotation and citation omitted). Here, the ALJ actively questioned the witnesses, and the Decision on Remand comports with the standards identified by the Ninth Circuit.

1  E.M.'s intellectual abilities, and the Court finds, for the reasons stated by the ALJ, Viall's

2  testimony was credible.

3          Accordingly, the Court finds PVUSD's assessments in 2004 and 2005 were, based

4  on the evidence available at the time those assessments was made, reasonable.  See

5  E.M., 652 F.3d at 1004 (holding school district has duty to "make a reasonable choice

6  between valid but conflicting test results in determining whether a 'severe discrepancy'

7  exists").

8          The Court next considers whether that determination is altered by the addition of the

9  after-acquired assessments discussed above, specifically, Dr. Jacques' Assessment and

10  the PVUSD 2008 Assessment.  See Susan N. v. Wilson Sch. Dist., 70 F.3d 751, 762 (3rd

11  Cir. 1995) (holding evidence "acquired after the school district's decision regarding [a

12  student's] need for special education" is to be "considered only with respect to the

13  reasonableness of the district's decision at the time it was made"); E.M., 652 F.3d at 1005

14  (citing favorably to Susan N.).

15          Dr. Jacques opined that, based on evaluations she conducted in December 2007,

16  E.M. "currently meets California Ed. Code criteria for a specific learning disability according

17  to the current assessment results."  (See Dr. Jacques' 2007 Assessment at 9.)  Her opinion

18  was based on the results of standardized tests she employed, and, in particular, on her

19  finding a 25-point difference between E.M.'s intellectual abilities and his achievements.

20  Specifically, Dr. Jacques reported that E.M. obtained a "high average Perceptual

21  Reasoning" score of 110 on the then current version of the Wechsler Intelligence Test for

22  Children, the "WISC-IV," and a "low average Verbal Comprehension" score of 85 on a

23  standardized ability test.  (See id. at 5, 9.)  Dr. Jacques also noted E.M. had been tested by

24  Dr. Wright in 2004, that Dr. Wright had administered the WISC-III, a prior version of the

25  Wechsler, and that Dr. Wright's results "did not provide the data necessary to make a

26  diagnosis under California Ed. Code as there were not significant discrepancies between

27  E.M.'s [ ] scores."  (See id. at 8.)  With reference to the difference in the results obtained by

28  Dr. Wright in 2004 and by herself in 2007, Dr. Jacques posed the question, "Why has the

gap widened between E.M.'s measured IQ scores and his achievement scores?," and then answered, "[B]ecause of the proposed population advances in knowledge, the updated tests are harder," and, "[p]robably more importantly for E.M., the increased academic load in middle school and the cumulative experiences of failure have contributed to a widening gap in his intelligence and achievement levels." (See id. at 9.)

The PVUSD 2008 Assessment, based in part on testing conducted approximately two months after Dr. Jacques' testing by PVUSD and on PVUSD's consideration of prior testing including the December 2007 testing by Dr. Jacques, concluded:  "Based on current test finding[s,] it is recommended that E.M. be considered for special education services according to the Specific Learning Disability criteria whereby test results reveal severe delays in auditory processing and cognitive fluency that adversely hinder his learning." (See PVUSD 2008 Assessment at 31.)

E.M. argues the above assessments conducted, respectively, in late 2007 and February 2008, demonstrate the results of Dr. Wright's 2004 testing were "anomalous" (see Pl.'s Reply Brief on Remand at 14), and, consequently, that PVUSD acted unreasonably in using the WISC-III results obtained by Dr. Wright when it made its assessments in 2004 and 2005.  Further, E.M. argues, Dr. Jacques' 2007 Assessment establishes that E.M. "always has had a 'severe discrepancy.'"  (See Pl.'s Mem. of P. & A., filed February 21, 2008, at 10:21-23.)  The Court, however, finds the later assessments do not support a finding that, in 2004 and/or in 2005, PVUSD made unreasonable choices between valid but conflicting test results, or that said assessments otherwise support the findings proposed by E.M.

As Dr. Jacques noted, the results of testing conducted by Dr. Wright in 2004, using WISC-III, showed "there were not significant discrepancies between E.M.'s [ability and achievement] scores," whereas the K-ABC testing conducted by PVUSD in 2004 showed "there was a significant discrepancy."  (See Dr. Jacques' 2007 Assessment at 8.)  Nothing in Dr. Jacques' assessment, however, suggests she was of the view that the K-ABC results accurately measured E.M.'s intelligence in 2004, or that the WISC-III results had not; that

13

1   issue was not addressed by Dr. Jacques.  Rather, she limited the scope of her finding, that

2   a severe discrepancy existed, to the time of her evaluation, December 2007.  (See id. at 9

3   ("E.M. currently meets California Ed. Code criteria for a specific learning disability

4   according to the current assessment results.").)

5          Moreover, to the extent any inferences can be drawn from Dr. Jacques'

6   Assessment with respect to the reasonableness of PVUSD's determinations in 2004/2005,

7   those inferences do not assist E.M. in meeting his burden of proof.  First, Dr. Jacques

8   appears to have agreed with PVUSD that the WISC-III test was more reliable than the K-

9   ABC, as evidenced by Dr. Jacques' decision to employ in her own testing of E.M. the

10  updated version of the WISC-III rather than the K-ABC test or any updated version thereof.

11  Second, Dr. Jacques appears to have acknowledged that between 2004 and December

12  2007, the "gap" between E.M.'s intelligence and achievement had in fact "widened."[11]  (See

13  id.)

14         Similarly, the PVUSD 2008 Assessment contains no language suggesting that

15  PVUSD's 2004/2005 assessment was incorrect at the time.  Nor does it include any

16  findings suggesting some circumstance existed in 2008 from which it can inferred that

17  PVUSD's prior assessments in 2004 and 2005 were unreasonable.  Moreover, the PVUSD

18  2008 Assessment is of limited relevance, because the issue of whether a "severe

19  discrepancy" existed between E.M.'s achievements and abilities was not an analysis

20  PVUSD was required to conduct in 2008, due to a change in law, nor did it conduct such an

21  analysis in 2008.[12]

22

23         [11]As noted, Dr. Jacques attributed the difference between the results obtained by Dr.
    Wright in 2004 and her results in 2007 to changes in the standardized tests, as well as to
24  factors specific to E.M., such as his having an "increased academic load," given he was no
    longer in primary school and was now in middle school.  (See id. at 9.)
25

26         [12]Effective October 7, 2005, the Education Code was amended to provide that "in
    determining whether a pupil has a specific learning disability . . ., a local educational
27  agency is not required to take into consideration whether a pupil has a severe discrepancy
    between achievement and intellectual ability."  See Cal. Educ. Code § 56337(b) (Supp.
28  2012).  E.M. "does not argue the retroactivity of this change" in the law.  (See Pl.'s Mot. for
    Summ. J., filed August 5, 2008, at 9:22-24.)

14

1   Accordingly, the Court finds E.M. has failed to show that PVUSD's assessments in

2   2004 and 2005 were unreasonable.  See E.M., 652 F.3d at 1004 (holding school district

3   has duty to "make a reasonable choice between valid but conflicting test results in

4   determining whether a 'severe discrepancy' exists"); Hood, 486 F.3d at 1103 (9th Cir. 2007)

5   (holding, in IDEA action, "burden of proof in the district court rest[s] with the . . . party

6   challenging the administrative decision").

7   **B.  Other Health Impairment**

8   As set forth above, a "child with a disability," for purposes of the IDEA, is a child who

9   is in need of special education services as a result of having an impairment falling within

10   one of the ten categories set forth in 20 U.S.C. § 1401(3)(A).  Section 1401(3)(A) lists nine

11   defined categories, such as "intellectual disabilities," "serious emotional disturbance,"

12   "autism," and "specific learning disabilities," as well as a tenth category described more

13   broadly as "other health impairments."  See 20 U.S.C. § 1401(3)(A).  E.M. argues that his

14   auditory processing disorder qualifies as an "other health impairment."

15   At the time of the PVUSD assessments at issue herein, the Code of Federal

16   Regulations defined "other health impairment" as follows:

17   Other health impairment means having limited strength, vitality or alertness,
    including a heightened alertness to environmental stimuli, that results in
18   limited alertness with respect to the educational environment, that --

19   (i) Is due to chronic or acute health problems such as asthma, attention deficit
    disorder or attention deficit hyperactivity disorder, diabetes, epilepsy, a heart
20   condition, hemophilia, lead poisoning, leukemia, nephritis, rheumatic fever,
    and sickle cell anemia; and
21
    (ii) Adversely affects a child's educational performance.
22
    See 34 C.F.R. § 300.7(c)(9) (2005).
23
24   During that same time period, a California state regulation provided that a pupil who

25   met the following criteria was entitled to special education services:

26   A pupil has limited strength, vitality or alertness, due to chronic or acute
    health problems, including but not limited to a heart condition, cancer,
    leukemia, rheumatic fever, chronic kidney disease, cystic fibrosis, severe
27   asthma, epilepsy, lead poisoning, diabetes, tuberculosis and other
    communicable infectious diseases, and hematological disorders such as
28   sickle cell anemia and hemophilia which adversely affects a pupil's

15

1    educational performance.  In accordance with Section 5626(e) of the
2    Education Code, such physical disabilities shall not be temporary in nature as
     defined by Section 3001(v).

3    See Cal. Code Regs. tit. 5, § 3030(f) (2005).[13]

4        In its opinion, the Ninth Circuit noted "[t]he regulations contain a non-exhaustive list

5    of chronic and acute health problems, which does not include auditory processing

6    disorder," and directed this Court to consider "whether an auditory processing disorder may

7    qualify as an other health impairment."  See E.M., 652 F.3d at 1007.  Accordingly, the

8    Court sees its task as interpreting the IDEA in light of the above-quoted regulations.

9        E.M. initially asserts that courts, as well as hearing officers conducting IDEA due

10   process hearings, have found auditory processing disorders do qualify as "other health

11   impairments," and argues this Court should follow such authority.  E.M., however, cites no

12   opinion by any judge or hearing officer that has so held,[14] and the Court has located none.

13   E.M. further asserts that his current school district determined his auditory processing

14   disorder qualifies as an "other health impairment"; E.M. offers no evidence, however, to

15   support such assertion.[15]  In the absence of any authority or evidence of prior

16   _____

17       [13]Although § 3030(f) does not expressly employ the term "other health impairment,"
18   said regulation implements § 56026 of the California Education Code, see Cal. Code Regs.
     tit. 5, § 3030 (2005); § 56026 defines "child with a disability," for purposes of state law, as
     having the same meaning as "child with a disability" under the IDEA,  see Cal. Educ. Code
19   § 56026(a) (2005).

20       [14]Although some of the cases cited by E.M. were brought by students who had or
     were alleged to have had an auditory processing disorder, see, e.g., Houston Indep. Sch.
21   Dist. v. V.P., 582 F.3d 576, 581 (5th Cir. 2009), none includes a finding that an auditory
     processing disorder is a qualifying "other health impairment," as opposed to or in addition to
22   a "specific learning disability."  The only cited case even arguably supporting E.M.'s
     assertion is a decision by a hearing officer, in which the hearing officer noted that a school
23   district had designated a student as "other health impaired" in light of a "central auditory
     processing disfunction" (see Pl.'s Req. for Judicial Notice Ex. A at 5); the hearing officer in
24   that case, however, did not determine whether or not the district's designation was correct,
     as the issues before the hearing officer did not pertain to whether the student was disabled,
25   but, rather, to the types of services to which the student was entitled.

26       [15]E.M. relies on a 2008 determination made by the Fullerton Joint Union High School
     District ("FJUHSD"), E.M.'s present school district.  (See Pl.'s Req. for Judicial Notice Ex.
27   C.)  Specifically, the second page of an Individualized Education Program ("IEP") prepared
     by FJUHSD contains a section titled "Disability".  (See id.)  In that section, FJUHSD
28   checked a box that reads "Specific Learning Disability" and also checked a box that reads
     "Secondary Disability (if applicable)."  (See id.)  Next to the "Secondary Disability" box,

1    determinations, the Court considers the matter as one of first impression.

2         Statutes are "interpreted according to canons of construction."  See Black & Decker

3    Corp. v. Commissioner, 986 F.2d 60, 65 (4th Cir. 1993).  The "tenets of statutory

4    construction apply with equal force to the interpretation of regulations."  See Boeing Co. v.

5    United States, 258 F.3d 958, 967 (9th Cir. 2001) (citing Black & Decker Corp., 986 F.2d at

6    65).  In ascertaining the meaning of a federal statute, a court's purpose is to "ascertain the

7    intent of Congress in enacting a particular statute."  See United States v. Daas, 198 F.3d

8    1167, 1174 (9th Cir. 1999).  In so doing, the court first "look[s] to the plain language of the

9    statute" in light of the "entire statutory scheme."  See id.  "If the statute uses a term which it

10   does not define, the court gives that term its ordinary meaning."  Id.  "The plain meaning of

11   the statute controls, and courts will look no further, unless its application leads to

12   unreasonable or impracticable results."  Id.  "If the statute is ambiguous — and only then —

13   courts may look to its legislative history for evidence of congressional intent."  Id.  Similarly,

14   under California law, a court, in ascertaining the Legislature's intent, "begins with the text of

15   a statute," and a "statute's words must be assigned their usual and ordinary meanings and

16   evaluated in context."  See Campbell v. Pricewaterhousecoopers, LLP, 642 F.3d 820, 826

17   (9th Cir. 2011).  If the "plain meaning [of a California statute] is unambiguous, the inquiry

18   ends"; if the statute is ambiguous, a court "considers further interpretative aids" such as

19   "drafting history."  See id.

20        As set forth above, Congress, in enacting the IDEA, defined, in § 1401(3)(A), the

21   term "child with a disability," and listed therein ten categories of disabilities, including

22   "specific learning disabilities" and "other health impairments."  See 20 U.S.C. § 1401(3)(A).

23   _____

24   FJUHSD wrote "280 Other Health Impairment (OHI)."  (See id.)  Nothing in the IEP
     discusses the nature of either the "Specific Learning Disability" or the "Secondary

25   Disability," and, consequently, the IEP does not support E.M.'s argument that FJUHSD
     considers E.M.'s auditory processing disorder to be an "other health impairment."  Rather,

26   given that E.M. claims to have both an auditory processing disorder and ADD, it appears
     more likely FJUHSD treated the former as the "Specific Learning Disability" and the latter

27   as the "Secondary Disability," particularly given FJUHSD's apparent acknowledgment of
     both impairments.  (See id., second of two pages numbered "15 of 16"); see also 34 C.F.R.

28   § 300.7(c)(9) (2005) (listing "attention deficit disorder" as example of health problem that
     can qualify as "other health impairment").

17

1   The IDEA does not itself further define the listed categories; rather, definitions of the

2   categories are set forth in federal and state regulations.

3       In the regulations, "specific learning disability" is defined to mean "a disorder in one

4   or more of the basic psychological processes involved in understanding or in using

5   language," see 34 C.F.R. § 300.7(c)(10) (2005); Cal. Code Regs. tit. 5, § 3030(j) (2005),

6   provided such disorder results in a "severe discrepancy between [the child's] intellectual

7   ability and achievement," see Cal. Code Regs. tit. 5, § 3030(j) (2005); see also Cal. Educ.

8   Code § 56337 (2005).  A "specific learning disability" thus is "specific" to disorders

9   adversely affecting the processing of the written and/or spoken word.  As is set forth in the

10  applicable regulations, such processing disorders expressly include "auditory processing"

11  disorders.  See Cal. Code Regs. tit. 5, § 3030(j)(1) (2005).

12      As defined in the regulations, an "other health impairment" is a "chronic and acute

13  health problem" that "[a]dversely affects a child's educational performance."  See 34 C.F.R.

14  § 300.7(c)(9) (2005); see also Cal. Code Regs. tit. 5, § 3030(f) (2005) (providing pupil is

15  entitled to special education where pupil has "chronic and acute health problem[ ]" that

16  "adversely affects a pupil's educational performance").  As the Ninth Circuit observed, the

17  regulations include non-exhaustive lists; those lists, when combined, provide the following

18  examples:  asthma, attention deficit disorder or attention deficit hyperactivity disorder,

19  cancer, chronic kidney disease, cystic fibrosis, diabetes, epilepsy, a heart condition,

20  hemophilia, lead poisoning, leukemia, nephritis, rheumatic fever, sickle cell anemia, and

21  tuberculosis and other communicable infectious diseases.  See 34 C.F.R. § 300.7(c)(9)

22  (2005); Cal. Code Regs. tit. 5, § 3030(f) (2005).  As recognized in the regulations, what

23  each of these illnesses or medical conditions has in common is its potential to "limit[ ] [a

24  child's] strength, vitality or alertness" as a matter of general "health."  See 34 C.F.R.

25  § 300.7(c)(9) (2005); Cal. Code Regs. tit. 5, § 3030(f) (2005).[16]

26  _____

27      [16]To the extent E.M. suggests the effects of attention deficit disorder ("ADD") are
    analogous to those caused by an auditory processing disorder, E.M. offers no support for
28  such comparison, and, indeed, the medical authority is to the contrary.  See American
    Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 85-86 (4th ed.

1    In sum, the regulations defining "specific learning disability" and "other health

2 impairment" pertain to two different categories of impairments.

3    E.M. argues the same impairment can qualify as both a "specific learning disability"

4 and an "other health impairment." The plain meaning of "other," however, is "another."

5 See Webster's II New College Dictionary 776 (1995). Consequently, the category "other

6 health impairments" necessarily consists of impairments not otherwise included in the

7 categories identified in § 1401(3)(A). Because a qualifying auditory processing disorder is

8 a specific learning disability, see 34 C.F.R. § 300.7(c)(10) (2005); see Cal. Code Regs. tit.

9 5, § 3030(j) (2005), it necessarily follows that an auditory processing disorder cannot at the

10 same time be an "other health impairment."

11    A contrary finding would effectively negate and render superfluous the statutory and

12 regulatory provisions that a "disorder in a basic psychological process" qualifies as a

13 "specific learning disability" only if, as a result of such disorder, a "severe discrepancy"

14 exists between the child's intellectual ability and academic achievement. See Cal. Educ.

15 Code § 56337 (2005); Cal. Code Regs. tit. 5, § 3030(j) (2005); see also Hart v. McLucas,

16 535 F.2d 516, 519 (9th Cir. 1976) (holding "in the construction of administrative regulations,

17 as well as statutes, it is presumed that every phrase serves a legitimate purpose and,

18 therefore, constructions which render regulatory provisions superfluous are to be avoided").

19 If a "specific learning disability" were deemed to constitute an "other health impairment" as

20 well, a child with a specific learning disability would need to show only a generalized

21 "adverse[ ]" effect on academic performance. See 34 C.F.R. § 300.7(c)(9) (2005). As

22 PVUSD argued at the hearing, and E.M. did not dispute, the "adversely affects" standard

23 and the "severe discrepancy" standard are different. E.M. fails to explain why Congress,

24 for purposes of the IDEA, would have intended the same impairment be assessed under

25 two tests of differing magnitude.

26 ──────────────

27 2000) ("Attentional and behavioral manifestations [of ADD] usually appear in multiple
contexts, including home, school, work, and social situations," and cannot be diagnosed if
28 the manifestations are present in only one setting such as at a school.).

1         A child, of course, can have more than one impairment, each of which may

2   independently qualify as a disability for purposes of § 1401(3)(A).  For a qualifying

3   impairment to be an "other" health impairment, however, it must be "another," that is,

4   different from an impairment recognized as falling within a specified category set forth in

5   § 1401(3)(A).

6         Accordingly, the Court finds E.M. has failed to show an auditory processing disorder

7   can qualify as an "other health impairment" for purposes of the IDEA.

8                                             **CONCLUSION**

9         For the reasons stated above, PVUSD is entitled to judgment in its favor on E.M.'s

10  remaining claims.

11        **IT IS SO ORDERED.**

12

13  Dated:  March 16, 2012

14                                      MAXINE M. CHESNEY
                                        United States District Judge